# In the United States Court of Federal Claims

No. 15-348C
(Filed: January 13, 2016)

| | | |
|---|---|---|
| ************************************ | | |
| KANSAS CITY POWER & LIGHT CO., Plaintiff, | * | Contract Disputes Act of 1978; Motion to Dismiss; RCFC 12(b)(1); Contractual Indemnity; Placeway; Breach of Contract; J. Cooper |
| v. | * | |
| THE UNITED STATES, Defendant. | * | |
| ************************************ | | |

Daniel J. Donohue, Washington, DC, for plaintiff.

Amanda L. Tantum, United States Department of Justice, Washington, DC, for defendant.

## ORDER AND OPINION

**SWEENEY**, Judge

Before the court is defendant's motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff, Kansas City Power & Light Co. ("KCP&L"), seeks indemnification by the United States under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (2012) ("CDA"), for the cost of settling a wrongful death suit stemming from an electrical accident that occurred on property owned by defendant. The court denies plaintiff's request for oral argument as unnecessary and denies defendant's motion in its entirety.

## I. BACKGROUND

### A. Factual History

Plaintiff is an electrical utility company headquartered in Kansas City, Missouri. Compl. ¶ 1. Plaintiff provides electrical services to both residential and commercial customers in Missouri and Kansas. Id. On or about August 19, 2005, defendant, acting through the General Services Administration ("GSA"), entered into a contract with plaintiff for the delivery of electrical utility services to the Hardesty Federal Complex ("HFC"), a GSA property located in Kansas City, Missouri. Id. ¶ 6. Attached to and incorporated into the contract was a tariff schedule that was publicly filed with the Missouri Public Service Commission. Id. ¶ 39. The schedule provided plaintiff's rates, terms, and conditions of service, and included an indemnity

provision. Id. ¶¶ 40-41. Pursuant to the contract, plaintiff agreed to provide defendant with electrical services for a five-year term beginning on September 15, 2004, and concluding on September 13, 2009. Id. ¶ 14.

On or about August 10, 2006, GSA employee David Eubank received fatal burns from an arc blast that occurred while he was working in Building 13, an electrical substation vault located at the HFC. Id. ¶ 15. Mr. Eubank died eight days later, on August 18, 2006. Id.

### B. Procedural History

On March 27, 2007, Kembra Eubank, David Eubank's wife, sued plaintiff for negligence and loss of consortium in Missouri state court. Id. ¶ 21. In the fall of that year, the United States was named as a third party defendant and the case was removed to federal court. Id. ¶ 23. On April 17, 2009, defendant was dismissed from the action and on May 18, 2010, plaintiff entered into a settlement agreement with Mrs. Eubank. Id. ¶ 27. Pursuant to the terms of the agreement, plaintiff paid Mrs. Eubank $2,250,000. Id. ¶ 29.

On or about June 25, 2014, plaintiff submitted a certified claim to the GSA's Contracting Officer ("CO") and requested a final decision. Id. ¶ 31. In its certified claim, plaintiff requested reimbursement for not only the amount it paid Mrs. Eubank, but also for the costs it incurred defending the action in the underlying case, which totaled $1,756,138.14. Id. ¶¶ 28, 31. Thus, plaintiff sought a total of $4,006,138.14 ($2,250,000 + $1,756,138.14). Id. ¶ 31. On January 27, 2015, the CO issued his final decision denying plaintiff's claim. Id. ¶ 33.

On April 6, 2015, plaintiff filed a complaint in this court, setting forth two counts. Id. ¶ 33. Plaintiff's first count is captioned "Contractual Indemnity"; plaintiff's second is captioned "Breach of Contract." Id. ¶¶ 57-75.

## II. LEGAL STANDARDS

### A. RCFC 12(b)(1)

RCFC 12(b)(1) provides that the United States may, by motion, assert the defense of lack of subject matter jurisdiction. In ruling on such a motion, the court assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). However, the plaintiff bears the burden of proving by a preponderance of the evidence that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). In addition, the court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974). Any ambiguities must be "resolved against the assumption of jurisdiction." Mars, Inc. v. Kabushiki-Kaisha Nippon Conlux, 24 F.3d 1368, 1373 (Fed. Cir. 1994). Ultimately, if the court finds that it lacks subject matter jurisdiction over a claim, the court must dismiss that claim. See RCFC 12(h)(3).

**B. The Contract Disputes Act of 1978**

Under the Tucker Act, the United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). The Tucker Act also confers upon the Court of Federal Claims specific "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of [the CDA]." Id. § 1491(a)(2).

In order for such jurisdiction to exist, a contractor must first submit a timely written claim, generally within six years of its accrual date, to the CO. See 41 U.S.C. § 7103(a)(1)-(2), (4)(a). Next, the CO must issue a timely written decision.[1] Id. § 7103(a)(3). Lastly, the contractor must file an appeal with this court "within 12 months from the date of receipt of a contracting officer's decision." Id. § 7104(b)(3).

With respect to what constitutes a claim, the CDA is silent. However, according to the Federal Acquisition Regulation ("FAR"), a claim is defined as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." FAR § 52.233-1(c). For claims greater than $100,000, the regulation further requires the contractor to certify 1) that "the claim is made in good faith"; 2) that "the supporting data are accurate and complete to the best of the contractor's knowledge and belief"; 3) that "the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable"; and 4) that "the certifier is authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 7103(b)(1).

Significantly, the claim need not be "submitted in any particular form or use any particular wording." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). Rather, "[a]ll that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Id. "The purpose of this requirement is resolution at the contracting officer level, an objective that would be hindered if the claim heard in court is substantially different from the one presented to the contracting officer." Affiliated Constr. Grp., Inc. v. United States, 115 Fed. Cl. 607, 611-12 (2014) (citing M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1331 (Fed. Cir. 2010)). Thus, if an appeal of the CO's decision is later filed in this court, in order for this court to have jurisdiction, the complaint must be "based

[1] For claims of $100,000 or less, the CO must issue his decision within sixty days of his "receipt of a written request from the contractor that a decision be rendered within that period." Id. § 7103(f)(1). For claims of more than $100,000, the CO must either issue his decision within the sixty day period or let the contractor know when the decision will be issued. Id. § 7103(f)(2). If the CO fails to issue a written decision within the requisite time period, such failure is deemed a denial of the contractor's claim and authorization of an appeal. Id. § 7103(f)(5).

on the same claim previously presented to and denied by the contracting officer." Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 417 (1987); see also 41 U.S.C. § 7104(b). In order to determine whether the claims are the same, the court must examine whether the claims 1) are based on the same underlying theory; 2) seek the same relief; and 3) arise from the same operative facts. Johnson Controls World Servs., Inc., v. United States, 43 Fed. Cl. 589, 594 (1999).

Operative facts are those "essential facts that give rise to a cause of action." Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 420 (2003). "In making such a determination, if the court will have to review the same or related evidence to make its decision, then only one claim exists, but if the claim presented to the contracting officer requires examination of a different or unrelated set of operative facts, then the claims are separate." Affiliated Constr. Grp., Inc., 115 Fed. Cl. at 612 (internal citations and quotation marks omitted). Stated differently, if the court must review "different kinds of proof, they are different claims for purposes of the CDA." Id. (citing Placeway Constr. Corp. v. United States, 920 F.2d 903, 909 (Fed. Cir. 1990); AAB Joint Venture v. United States, 75 Fed. Cl. 414, 422-23 (2007)).

## III. DISCUSSION

### A. Count One: Contractual Indemnity

#### 1. The Parties' Arguments

With respect to plaintiff's contractual indemnity count, defendant contends that although plaintiff has consistently stated that the accident occurred "downstream of KCP&L's point of delivery of electrical service to the GSA," the factual basis for plaintiff's claim has changed. Def.'s Mot. 10. Specifically, defendant contends that in the certified claim, plaintiff stated that the point of delivery was at the HFC property line, whereas in the complaint, plaintiff claims that the point of delivery was at the feeder lines. Id. Although defendant acknowledges that, following a request from the CO, plaintiff made additional representations regarding the location of the point of delivery, defendant claims that this information was never certified by the contractor and therefore "cannot constitute a claim, or part of a claim." Id. at 11-13. In addition, defendant contends that in the certified claim, plaintiff stated that plaintiff was not responsible for equipment located "downstream of the termination point," whereas in the complaint, plaintiff claims that defendant owned the conductor and switches. Id. at 13.

In its opposition to defendant's motion to dismiss, plaintiff counters that the complaint alleges the same underlying facts as the certified claim submitted to and ultimately decided by the CO. Pl.'s Opp'n 9. According to plaintiff, although its June 25, 2014 certified claim did not specifically state that the feeder lines into Building 13 were the point of delivery and that the accident occurred on defendant's side of this point, the information was relayed to the CO on July 30, 2014, and was considered by the CO prior to the issuance of his final decision. Id. at 11. According to plaintiff, no separate certification was required for this supplemental information because the information was based on the same operative facts. Id. at 12. As a result, plaintiff concludes that "[t]he Claim submitted to the Contracting Officer gave him adequate notice of the

basis and amount of the claim alleged in the Complaint and he actually made an informed judgment about it." Id. at 13.

In its reply, defendant argues that July 30, 2014 communication referenced by plaintiff was actually an electronic-mail message ("e-mail") from plaintiff's counsel to the CO and that it cannot take the place of a certified claim submitted by the contractor. Def.'s Reply 2. Defendant also argues that, based on the language of the CO's final decision, it is clear that although he considered the schematic drawings attached to the e-mail, he did not consider the contents of plaintiff's counsel's e-mail. Id. at 2-3.

**2. Analysis**

With respect to plaintiff's contractual indemnity count, the issue presented is whether it is based on the same underlying theory, seeks the same relief, and arises from the same operative facts as the certified claim.

In its June 25, 2014 certified claim, plaintiff made the following statements regarding the point of delivery, the location where electrical services were transferred from plaintiff to defendant:

> The claim seeks reimbursement of costs incurred by KCP&L in the defense and settlement of a wrongful death action stemming from an incident that occurred on U.S. government property "downstream" (i.e., beyond) of the termination point from KCP&L's provision of power to the government building.
>
> * * *
>
> Paragraph 1.11 [of the contract] defined "Point of Delivery" as follows:
>
>> The point at which the Company's conductors and/or equipment (other than the Company's meter installation) make electrical connection with the Customer's installation, unless otherwise specified in the Customer's service agreement.
>
> * * *
>
> The Contract further stated that KCP&L's responsibility ended at the point of delivery. Specifically, Paragraph 3.08 stated:
>
>> The obligation of the Company to supply electric service to the [Government] shall be completed by the supplying of such electric service at the [Government's] point of delivery for the operation

> of all electrical equipment on the premises of the [Government].
>
> * * *
>
> [KCP&L] shall be required only to furnish, install and maintain one connection from its distribution facilities, service conductors from such connection to the [Government's point of delivery and one meter installation to measure such electric service to the [Government].[2]
>
> * * *
>
> The foregoing makes it clear that KCP&L's obligation under the Contract was to provide electric service up to the termination point. That termination point was within the Hardesty Federal Complex. Therefore, the internal distribution of electric power was the responsibility of the Government.
>
> * * *
>
> In August 2006, during the service term of the Contract, a Federal Government employee, David Eubank, was performing functions of his employment in [a] federally owned and operated building. While inside the building Eubank came into contact with electrical equipment downstream of the termination point (i.e., beyond the point at which KCP&L's obligations under the Contract terminated and transferred to the Government).

Compl., Ex. 1 at 1-2.[3]

On July 23, 2014, the CO sent plaintiff's counsel an e-mail requesting supplemental documentation regarding the point of delivery: "As I sit here and read through KCP&L's claim, I would appreciate receiving from you any and all documentation you have in support of your claim. For instance, any drawings, blueprints, schematics, or similar documents that show the point of delivery of electricity at the former Hardesty complex." Pl.'s Opp'n, App. at 7-8. On July 30, 2014, plaintiff's counsel e-mailed the CO, inter alia, two engineering data maps, one dated November 6, 1968, and one dated May 15, 1999. Id. at 9. In the text of the e-mail, plaintiff's counsel stated that the maps were "essentially the same" and noted that the dotted line appearing at the top of the maps represented the HFC property line. Id. In addition, counsel stated that the dark triangle appearing just below the dotted line represented the point of delivery or "pothead." Id. Finally, counsel stated that the thick black rectangle (shown in an open position) appearing just below the point of delivery on GSA's side was the switch that Mr. Eubanks came in contact with at the time of his accident. Id. Subsequently, on October 16,

[2] This paragraph is reproduced exactly as it appears in the certified claim.
[3] Plaintiff's certified claim is the first of several documents included in Exhibit 1.

2014, plaintiff's counsel sent the CO, inter alia, what appears to be an annotated version of the previously submitted engineering map dated May 15, 1999. Id. at 13-16. On all of the maps submitted to the CO, the following phrase appears: "OWNERSHIP CHANGES AT PROPERTY LINE." Id. at 11-12, 16.

On January 27, 2015, the CO issued his final decision. See Compl., Ex. 5. First, the CO summarized plaintiff's claim as follows:

> KCP&L's claim for the $4,006,138.14 purportedly was based upon the following three (3) points as best gleaned by the Contracting Officer from its claim: 1. KCP&L's responsibility ended at some unidentified 'point of delivery'; 2. GSA had a duty to defend and hold harmless KCP&L for events occurring on GSA's side of that point of delivery; and 3. Mr. Eubank purportedly came into contact with electrical equipment on the GSA side of that point of delivery.

Id. at 3.

The CO then identified four disputed facts, one of which was the point of delivery. Id. at 4-5. With respect to this fact, the CO noted that all eight drawings submitted by plaintiff, the earliest of which was dated November 6, 1968, showed the point of delivery to be the HFC property line. Id. at 5. The CO then noted that a May 8, 1942 drawing submitted by defendant shows that the incoming line and transformers belong to plaintiff. Id. Significantly, the CO then stated the following:

> KCP&L failed to provide any drawing dated earlier than 1968. KCP&L, as a utility provider regulated by the Missouri Public Service Commission (MPSC), should be in the possession of a document that clearly determines the point of delivery of electrical service at the Hardesty Complex. GSA can only surmise this document does not exist or KCP&L would have submitted the drawing clearly stating the point of delivery with their claim.

Id.

Finally, the CO noted that plaintiff's own specifications, an August 1969 document entitled "Requirements for Privately Owned Substations 15 KV Voltage Class," states that the "CUSTOMER SHALL INSTALL AND OWN DUCT TO PROPERTY LINE" and that "KP&L SHALL INSTALL AND OWN CABLE TO CUSTOMER'S SWITCHGEAR AND TERMINATE ON CUSTOMER'S BUS." Id. From this document, the CO concluded the following:

> The electrical feed subject to KCP&L's claim enters the electrical vault (Building 13) from the North through an underground electrical conduit (i.e. duct). It enters through the floor of the vault

> at the Southwest corner and is routed to the ceiling where it connects to three (3) open arm switches. Only when those switch arms are in the closed position, does the electrical power first connect to the customer's bus. Until the electrical power terminates on the customer's bus, it is owned by KCP&L.
>
> Therefore, based upon the drawings held by the GSA, the drawings provided by KCP&L and the language in KCP&L's own specifications, it is the conclusion of the Contracting Officer that the Eubank incident occurred on equipment KCP&L owned, controlled or operated.

Id.

Ultimately, the CO provided the following rationale for his decision to deny plaintiff's certified claim in its entirety:

> 1. KCP&L failed to provide documentation to support its claim that clearly indicates the point of delivery. KCP&L, as the electrical utility provider for the Hardesty Federal Complex and governed by the MPSC, has the burden of producing documentation clearly identifying the Point of Delivery. The document defining the Point of Delivery should have been submitted by KCP&L with its certified claim. It was not.
>
> 2. KCP&L, through use of switch orders, exhibited that it maintained exclusive control over the switches in Building 13.
>
> 3. The yellow tags imply KCP&L was maintaining and yellow tagging its own equipment prior to the accident; and
>
> 4. KCP&L billing statements did not reflect any excess facility charge, thus indicating the point of delivery was not the property line but rather beyond the switches in which the accident occurred.
>
> The documentation the Contracting Officer requested from KCP&L supports the fact that KCP&L serviced and controlled electrical equipment located within Building 13 at the Hardesty Complex as evidenced by KCP&L's own specifications dated 1969, the switch orders, and yellow tags. Thus, it is the determination of the Contracting Officer [that] the accident involving Mr. Eubank occurred on the KCP&L side of KCP&L owned and operated equipment.

Id. at 8-9.

In the complaint, plaintiff claims the following with respect to the point of delivery:

> 9. Electrical supply to the Hardesty Complex was provided by KCP&L, through an electrical vault building inside the Hardesty Complex, owned by GSA, called Building 13.
>
> 10. Electrical supply was provided through two underground cables, called "feeders" which entered into a metal box that encased a "pothead," and divided the feeder line into three separate conductors.
>
> 11. These conductors were attached to switchgear that was owned by the GSA.
>
> 12. With the exception of KCP&L's feeder lines (i.e., KCP&L-owned distribution lines that form a part of KCP&L's electricity-delivery system) and metering equipment, all of the electrical equipment in Building 13 was owned by the GSA.
>
> * * *
>
> 16. Specifically, Mr. Eubank's death (the "accident") occurred at a switchgear located inside the GSA substation, downstream of KCP&L's point of delivery of electrical service to the GSA.

Compl. ¶¶ 9-12, 16.

First, it is undisputed that plaintiff's certified claim and count one of the complaint are based on the same underlying theory—contractual indemnity. Second, it is undisputed that they both seek the same relief—payment in the amount of $4,006,138.14. The only disputed issue is whether they arise from the same operative facts.

In the certified claim, plaintiff defines the location of the point of delivery as being alternatively at the HFC property line or within the confines of the HFC. In the complaint, plaintiff claims that the accident occurred at a switchgear, downstream from the point of delivery. Thus, although plaintiff clarifies, in its complaint, the exact location within the HFC where it contends the accident occurred, in both cases, it seeks indemnification for an accident it contends occurred beyond the point of delivery, on property owned by defendant. In other words, even though the complaint adds a detail that was not contained within the text of the

certified claim and was not referenced by the CO in his final decision,[4] the operative facts underlying both are the same.

As explained above, operative facts are those necessary to support a cause of action. In this case, the operative facts are those necessary to support plaintiff's claim of contractual indemnity. In assessing this claim, the CO therefore considered the following underlying operative facts: 1) the August 4, 1997 area-wide contract between the parties for electrical service; 2) the August 19, 2005 contract between the parties for electrical service to the HFC; 3) the Missouri tariff schedule, which was incorporated into the contract between the parties; 4) engineering data maps; 5) plaintiff's August 1969 specification for privately owned substations; 6) plaintiff's switch orders—internal documents regarding action necessary on the switches in the electrical substation; 7) plaintiff's yellow tags—tags used by plaintiff to label equipment; and 8) plaintiff's billing statements. See Compl., Ex. 5. Clearly, plaintiff's attempt to clarify the location of the point of delivery in its complaint is nothing more than argument by plaintiff's counsel. It therefore cannot be said that such a statement is akin to providing a new or different operative fact to this court.

In Placeway Construction Corp., the United States Court of Appeals for the Federal Circuit ("Federal Circuit") spoke to the issue of operative facts when it vacated the trial court's characterization of one of plaintiff's counts:

> The Claims Court also concluded that Placeway's Count VI, which seeks various adjustments for extended overhead, is a unitary claim requiring certification because the total adjustment sought is $119,585.91, a sum exceeding $50,000.00. The Claims Court concluded that there was only a single claim because it considered "delays in performance of the contract" to be "a common factual threat contributing to the creation of [Placeway's] claim." [citation omitted]. We disagree. Although there is a common type of fact involved in Placeway's various extended overhead claims, i.e., a cause of delay, that does not necessarily mean that each claim involves proof of a common or related set of operative facts.

920 F.2d at 908-09. Unlike Placeway, plaintiff's certified claim and count one of the complaint involve both 1) a common type of fact—proof of ownership/control; and 2) a common set of

[4] Defendant argues repeatedly that court cannot consider representations made by plaintiff's counsel to the CO outside of the underlying claim because these statements are not expressly certified by the contractor, as required under the CDA. See Def.'s Mot. 11-12; Def.'s Reply 2-5. The court agrees and has not taken into consideration the statements made by plaintiff's counsel in his July 30, 2014 e-mail to the CO. See NCLN20, Inc. v. United States, 82 Fed. Cl. 103, (2008) (citing Black Star Sec., Inc. v. United States, 5 Cl. Ct. 110, 115 (1984)) (finding that plaintiff's counsel's supplemental submission to the CO did not qualify as a certified claim under the CDA for purposes of establishing the court's jurisdiction).

underlying operative facts—contracts between the parties, engineering maps, work orders, etc.[5] See Scott Timber Co. v. United States, 333 F.3d 1358, 1365-66 (Fed. Cir. 2003) (holding, inter alia, that plaintiff's certified claim, wherein plaintiff claimed that the government's prolonged suspension of certain contracts was a breach because the government lacked the authority to do so, was based on the same operative facts as plaintiff's complaint, wherein plaintiff claimed that the government violated specific clauses of the contracts); Kellogg Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. 46, 49-50, 54-55 (2014) (holding, inter alia, that the operative facts supporting 1) plaintiff's claim for costs incurred in the defense and settlement of litigation of a third-party suit, based on a theory of contractual indemnification, as well as a request that the defendant participate in those suits, and 2) plaintiff's claim for litigation expenses in third-party suits, to include legal fees and costs incurred as a result of responding to a government investigation, based upon a theory of failure to reimburse, violation of the FAR, and breach of various obligations, were, save for one distinct claim for costs, the same).

Finally, the court notes that even if plaintiff's certified claim and complaint were not so clearly based on the same set of operative facts, the CO ruled on the key factual issue in this case—the location of the accident: "[I]t is the determination of the Contracting Officer [that] the accident involving Mr. Eubank occurred on the KCP&L side of KCP&L owned and operated equipment." Compl., Ex. 5 at 9. Thus, allowing plaintiff's indemnification count to go forward in this court would no way "'subvert the statutory purpose of requiring contractors first to submit their claims to the [CO]' to allow the CO to receive and pass judgment on the contractor's entire claim."[6]

**B. Count Two: Breach of Contract**

**1. The Parties' Arguments**

With respect to plaintiff's breach-of-contract count, defendant contends that plaintiff failed to make such a claim to the CO. Def.'s Mot. 20-21. Specifically, defendant contends that in its certified claim, plaintiff only sought reimbursement for the costs associated with the defense and settlement of the wrongful death action, whereas in the complaint, plaintiff claims

---

[5] Defendant argues that in Placeway, "the Federal Circuit concluded that the existence of a 'common type of fact' (such as factual allegations related to the point of delivery) did not demonstrate that the two claims sprung from a 'common or related set of operative facts.'" Def.'s Reply 6. In fact, the court concluded that the existence of common type of fact did not "necessarily mean that each claim involves proof of a common or related set of operative facts." See Placeway Constr. Corp., 920 F.2d at 909 (emphasis added). Contrary to defendant's interpretation, it is the court's view that the Federal Circuit only reached that conclusion because there were various claims before the trial court and the appellate court did not want to preclude the possibility that the delays in each case had different causes. Furthermore, that Placeway discusses "operative facts" in the context of a fragmented claim—which is not at issue in this case—in no way lessens its utility in informing this court as to the meaning of the term.

[6] Scott Timber Co., 333 F.3d at 1366 (quoting Croman v. United States, 44 Fed. Cl. 796, 801-02 (1999).

for the first time that defendant breached its contract with plaintiff by failing to defend it against the wrongful death action. Id. at 21.

Plaintiff counters that although the certified claim did not contain the phrase "breach of contract," because it alleged that defendant violated the contract's indemnity clause by failing to defend plaintiff in the wrongful death action, it was in essence a breach-of-contract claim. Pl.'s Opp'n 18. In the alternative, plaintiff argues that even if it did assert a novel theory in its complaint, because the breach-of-contract claim is based on the same operative facts and seeks the same relief as the failure-to-defend claim, this court has jurisdiction over count two. Id. at 18-19.

**2. Analysis**

With respect to plaintiff's breach-of-contract count, the issue presented is, again, whether it is based on the same underlying theory, seeks the same relief, and arises from the same operative facts as the certified claim. In this case, it is undisputed that both seek the same relief—payment in the amount of $4,006,138.14. Second, because the statements in the complaint supporting count two are the same as those supporting count one, the court concludes that both arise from the same operative facts. The only remaining issue therefore is whether they are based on the same underlying theory.

As explained by the court in J. Cooper & Assocs., Inc. v. United States, 47 Fed. Cl. 280 (2000), there are two historical categories of government contract claims:

> [T]raditionally, government contract claims may be placed into one of two categories. The first category is for "relief arising under" the contract. See 48 C.F.R. § 52.233-1 (1994). This is defined as "a claim that can be resolved under a contract clause." Id. The second category of claim reflected in the disputes clause is for those claims "relating to" a contract. Id. These are claims that involve the contract, but are not resolved under any contract clause.

Id. at 285.

In that case, the plaintiff entered into a letter contract with the government to provide marketing and advertising services to aid in the recruitment of additional officer corps personnel. Id. at 281. At a certain point, the plaintiff was informed that the contract would not be definitized and would be permitted to lapse. Id. at 282. The plaintiff was also told to "'prepare a proposal for costs incurred in the performance of the contract.'" Id. (internal citations omitted). After the plaintiff's claim for "'changes, delays, and additional costs incurred . . . as a direct result of the government's actions in awarding, managing, and constructively terminating'" the contract was denied by the CO, the plaintiff filed a complaint in this court, alleging breach of contract. Id. (internal citations omitted). In ruling that the claims were different, the court focused on the different sources of liability underlying each theory. Id. at 288. According to the court, the plaintiff's underlying claim involved liability for the termination costs that resulted

from "the government's actions in awarding, managing, and constructively terminating this contract," and included the cost of "employees and equipment obtained for the work; work performed but unreimbursed; and legal and other business services for termination." Id. In contrast, the court noted, plaintiff, in its complaint, alleged that "[w]hen the agency failed to definitize the contract, it deprived [plaintiff] of the opportunity to offset costs through future work under the contract," and sought reimbursement for lost profits. Id.

In this case, the certified claim is titled "CLAIM FOR REIMBURSEMENT OF COSTS IN DEFENSE OF WRONGFUL DEATH ACTION" and plaintiff stated in its introduction to that claim that it was seeking "reimbursement of costs incurred by KCP&L in the defense and settlement of a wrongful death action stemming from an incident that occurred on U.S. government property 'downstream' (i.e., beyond) of the termination point from KCP&L's provision of power to the government building." Compl., Ex. 1 at 3. Plaintiff next noted that the conditions of service were set forth in a tariff schedule that was attached to the parties' contract. Id. Plaintiff then reproduced Paragraph 4.12 of the tariff, which stated the following:

> 4.12 INDEMNITY TO COMPANY: The Customer shall indemnify, save harmless and defend the Company against all claims, demands, cost or expense, for loss, damage or injury to persons or property, in any manner directly or indirectly connected with, or growing out of the distribution or use of electric services by the Customer at or on the Customer's side of the point of delivery.

Id. at 5. Finally, plaintiff claimed that, pursuant to the above provision, "the Government had an affirmative duty to defend KCP&L against the claim from Eubank and to hold KCP&L harmless," and because it failed to do so, plaintiff was now entitled to seek reimbursement. Id.

In count two of the complaint, plaintiff makes the following allegations in support of its claim of breach of contract:

> 67. The Government and KCP&L entered into a valid Contract on or about August 19, 2005, whereby KCP&L was to deliver electric utility service to the Hardesty Federal Complex in Kansas City, Missouri. GSA and KCP&L signed an area-wide utility contract (GS-00P-97-BSD-0063), dated August 4, 1997, for the provision of electrical service for franchised service territory in Missouri and Kansas. It was under this area-wide utility contract that the specific Contract at issue here was let to KCP&L.
>
> 68. Under Paragraph 4.12 of the Tariff, which was incorporated into the Contract, the Government had a duty to "indemnity, save harmless, and defend" KCP&L against the Plaintiff's claims in the Underlying Action.

> 69. The Government breached this duty by failing to defend KCP&L in the Underlying Action.

Compl. ¶¶ 67-69.

In this case, it is clear that irrespective of the way in which the counts are captioned, unlike J. Cooper, both plaintiff's certified claim and count two of the complaint are based on the same underlying theory—indemnification pursuant to Paragraph 4.12 of the Tariff.  This case is further distinguishable from J. Cooper in that plaintiff sought the same relief in its certified claim as it does in count two—reimbursement for the amount paid Mrs. Eubank plus the cost of defending the suit brought by her.  Thus, plaintiff has arguably only asserted one legal theory in this case, that of contractual indemnity.  In any event, jurisdiction in this court is appropriate.

## IV.  CONCLUSION

In sum, the court **DENIES** defendant's motion to dismiss plaintiff's complaint for lack of jurisdiction pursuant to RCFC 12(b)(1).

**IT IS SO ORDERED.**

                          s/ Margaret M. Sweeney
                          MARGARET M. SWEENEY
                          Judge