# In the United States Court of Federal Claims

No. 15-348C
(Filed: March 27, 2017)

```
*************************************
KANSAS CITY POWER & LIGHT CO.,     *
                                   *   Contract Disputes Act of 1978; Motion
              Plaintiff,           *   to Strike; RCFC 12(f); Collateral Source
                                   *   Rule; Remote Transactions Rule
v.                                 *
                                   *
THE UNITED STATES,                 *
                                   *
              Defendant.           *
*************************************
```

Daniel J. Donohue, Washington, DC, for plaintiff.

Amanda L. Tantum, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff, Kansas City Power & Light Co. ("KCP&L"), seeks indemnification by the United States ("defendant" or "the government") under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101-7109 (2012), for the cost of settling a wrongful death suit stemming from an electrical accident that occurred on property owned by defendant. Before the court are four motions: (1) plaintiff's motion to strike defendant's seventh affirmative defense; (2) defendant's motion to compel the production of documents and answers to requests for admissions; (3) plaintiff's motion to quash defendant's subpoena to AEGIS Insurance Services, Inc. ("AEGIS"), and for a protective order; and (4) plaintiff's motion for leave to use depositions taken in the underlying wrongful death suit. The court deems oral argument unnecessary and resolves the first motion in this opinion and order. The remaining three motions will be resolved in subsequent opinions and orders.

## I. BACKGROUND

### A. Factual History

Plaintiff is an electrical utility company headquartered in Kansas City, Missouri. Compl. ¶ 1. It provides electrical services to both residential and commercial customers in Missouri and Kansas. Id. On or about August 19, 2005, the United States, acting through the General Services Administration ("GSA"), entered into a contract with plaintiff for the delivery of

electrical utility services to the Hardesty Federal Complex ("HFC"), a GSA property located in Kansas City, Missouri.  Id. ¶ 6.  Attached to and incorporated into the contract was a tariff schedule that was publicly filed with the Missouri Public Service Commission ("Tariff").  Id. ¶ 39.  The schedule provided plaintiff's rates, terms, and conditions of service, and included an indemnity provision.  Id. ¶¶ 40-41.  Pursuant to the contract, plaintiff agreed to provide defendant with electrical services for a five-year term beginning on September 15, 2004, and concluding on September 13, 2009.  Id. ¶ 14.

On or about August 10, 2006, GSA employee David Eubank received fatal burns from an arc blast that occurred while he was working in Building 13, an electrical substation vault located at the HFC.  Id. ¶ 15.  Mr. Eubank died eight days later, on August 18, 2006.  Id.

### B. Procedural History

On March 27, 2007, Kembra Eubank, David Eubank's wife, sued plaintiff for negligence and loss of consortium in Missouri state court.  Id. ¶ 21.  In the fall of that year, the United States was named as a third-party defendant and the case was removed to federal court.  Id. ¶ 23.  On April 17, 2009, defendant was dismissed from the action and on May 18, 2010, plaintiff entered into a settlement agreement with Mrs. Eubank.  Id. ¶ 27.  Pursuant to the terms of the agreement, plaintiff paid Mrs. Eubank $2,250,000.  Id. ¶ 29.

On or about June 25, 2014, plaintiff submitted a certified claim to GSA's Contracting Officer ("CO") and requested a final decision.  Id. ¶ 31.  In its certified claim, plaintiff requested reimbursement for not only the amount it paid Mrs. Eubank, but also for the costs it incurred defending the action in the underlying case, which totaled $1,756,138.14.  Id. ¶¶ 28, 31.  Thus, plaintiff sought a total of $4,006,138.14 ($2,250,000 + $1,756,138.14).  Id. ¶ 31.  On January 27, 2015, the CO issued his final decision denying plaintiff's claim.  Id. ¶ 33.

On April 6, 2015, plaintiff filed a two-count complaint in this court.  Id.  Plaintiff's first count is labeled "Contractual Indemnity"; plaintiff's second is labeled "Breach of Contract."  Id. ¶¶ 57-75.

On July 20, 2015 defendant filed a motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  On January 31, 2016, the court denied the motion as to both counts of the complaint. In its amended answer, defendant denies liability and asserts seven affirmative defenses:  (1) statute of limitations, (2) laches, (3) waiver, (4) equitable estoppel, (5) contributory negligence, (6) failure to mitigate, and (7) offset.  Am. Answer 11-12.

### C. The Contract Disputes Act of 1978

Under the Tucker Act, the United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  The Tucker

Act also confers upon the Court of Federal Claims specific "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of [the CDA]." Id. § 1491(a)(2).

In order for such jurisdiction to exist, a contractor must first submit a timely written claim, generally within six years of its accrual date, to the CO. See 41 U.S.C. § 7103(a)(1)-(2), (4)(A). Next, the CO must issue a timely written decision.[1] Id. § 7103(a)(3). Lastly, the contractor must file an appeal with this court "within 12 months from the date of receipt of a contracting officer's decision." Id. § 7104(b)(3).

With respect to what constitutes a claim, the CDA is silent. However, according to the Federal Acquisition Regulation ("FAR"), a claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." FAR § 52.233-1(c). For claims greater than $100,000, the CDA further requires the contractor to certify that (1) "the claim is made in good faith"; (2) that "the supporting data are accurate and complete to the best of the contractor's knowledge and belief"; (3) "the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable"; and (4) "the certifier is authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 7103(b)(1).

Significantly, the claim need not be "submitted in any particular form or use any particular wording." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). Rather, "[a]ll that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Id. "The purpose of this requirement is resolution at the contracting officer level, an objective that would be hindered if the claim heard in court is substantially different from the one presented to the contracting officer." Affiliated Constr. Grp., Inc. v. United States, 115 Fed. Cl. 607, 611-12 (2014) (citing M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1331 (Fed. Cir. 2010)). Thus, if an appeal of the CO's decision is later filed in this court, in order for this court to have jurisdiction, the complaint must be "based on the same claim previously presented to and denied by the contracting officer." Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 417 (1987); see also 41 U.S.C. § 7104(b). To determine whether the claims are the same, the court must examine whether the claims 1) are based on the

---

[1] For claims of $100,000 or less, the CO must issue his decision within sixty days of his "receipt of a written request from the contractor that a decision be rendered within that period." 41 U.S.C. § 7103(f)(1). For claims of more than $100,000, the CO must either issue his decision within the sixty-day period or let the contractor know when the decision will be issued. Id. § 7103(f)(2). If the CO fails to issue a written decision within the requisite time period, such failure is deemed a denial of the contractor's claim and authorization of an appeal. Id. § 7103(f)(5).

same underlying theory; 2) seek the same relief; and 3) arise from the same operative facts.[2] Scott Timber v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003).

## II. MOTION TO STRIKE

In its motion, plaintiff moves this court, pursuant to RCFC 12(f) to strike defendant's seventh affirmative defense—offset.

### A. Legal Standard

Pursuant to RCFC 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The court may do so sua sponte or on motion. RCFC 12(f). "Notably, federal courts generally are reluctant to respond favorably to motions to strike." Reunion, Inc. v. United States, 90 Fed. Cl. 576, 580-81 (2009). "When considering a motion to strike a defense, the court must 'construe the pleadings liberally to give the defendant a full opportunity to support its claims at trial.'" Entergy Nuclear Fitzpatrick, LLC v. United States, 93 Fed. Cl. 739, 742 (2010) (internal quotation marks omitted). Thus, if the resolution of such a motion "depends on disputed issues of fact or questions of law," the motion should not be granted. Reunion, 90 Fed. Cl. at 581 (internal quotation marks omitted).

### B. Discussion

#### 1. The Parties' Competing Positions

In its motion, plaintiff seeks to strike defendant's seventh affirmative defense on the grounds that (1) the court lacks subject matter jurisdiction over defendant's offset claim; and (2) defendant, as the breaching party, cannot benefit from a separate contract made by plaintiff and its insurer. Pl.'s Mot. to Strike 1-2. In support of its first argument, plaintiff contends that the court lacks jurisdiction because defendant failed to first raise the defense, which plaintiff characterizes as a claim, with the CO under the CDA. Id. at 2-3. In support of its second argument, plaintiff contends that the collateral source rule bars defendant's assertion of the defense as a matter of law: "The collateral source rule applies in breach of contract actions in this Court to prevent the breaching party from obtaining an inequitable windfall on the basis of collateral benefits received by the non-breaching party." Id. at 3. In other words, plaintiff claims that because defendant intentionally breached the indemnity provisions of the Tariff, defendant

---

[2] Operative facts are those "essential facts that give rise to a cause of action." Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 420 (2003). "In making such a determination, if the court will have to review the same or related evidence to make its decision, then only one claim exists, but if the claim presented to the contracting officer requires examination of a different or unrelated set of operative facts, then the claims are separate." Affiliated Constr. Grp., Inc., 115 Fed. Cl. at 612 (internal citations and quotation marks omitted). Stated differently, if the court must review "different kinds of proof, they are different claims for purposes of the CDA." Id. (citing Placeway Constr. Corp. v. United States, 920 F.2d 903, 909 (Fed. Cir. 1990); AAB Joint Venture v. United States, 75 Fed. Cl. 414, 422-23 (2007)).

should not be permitted to offset the damages it owes plaintiff because plaintiff received money, in the form of insurance payments, from a third source. Id. at 6. Plaintiff also contends, in support of its second argument, that defendant is precluded from asserting the affirmative defense of offset because of the remote transactions rule, which provides that remote, third-party transactions should not be considered when determining a breaching party's damages in a separate contract action. Id. at 8. According to plaintiff, the insurance agreement between plaintiff and AEGIS predates the Eubank case as well as defendant's breach of its contractual duty to indemnify plaintiff and therefore is irrelevant to the court's calculation of damages owed by defendant. Id. at 9. In the alternative, plaintiff argues that even if the court permits defendant to offset amounts paid by AEGIS in the Eubank case, plaintiff is entitled to those offset amounts because they were assigned to plaintiff. Id. at 9-10.

Defendant asserts three arguments in opposition to plaintiff's motion to strike. Initially, defendant claims that plaintiff cannot satisfy the high standards necessary to warrant granting a motion to strike an affirmative defense. Def.'s Resp. Mot. to Strike 2-7. First, defendant observes that the question of whether plaintiff's claimed damages can be offset by reimbursement it received from its insurer is a legal dispute and that courts generally do not favor granting such motions unless it appears likely that plaintiff will succeed. Id. at 4. Second, defendant argues that plaintiff has failed to demonstrate why defendant should be denied the chance to develop its theory in discovery, especially in light of the fact that plaintiff has not alleged that it would be in any way prejudiced by such development. Id. at 5-7. Alternatively, defendant contends that if the court grants plaintiff's motion, defendant should be allowed to file an amended pleading. Id. at 7.

Next, defendant argues that the affirmative defense of offset is available to it in this case. Id. at 7-24. First, defendant claims that the court does possess jurisdiction to consider its offset theory: "Our assertion, in our seventh affirmative defense, that KCP&L's claims in this Court 'should be offset or reduced by amounts claimed as damages . . . for which plaintiff was reimbursed in whole or in part by an insurer,'" Am. Answer 12, is not an independent claim that the Government could assert against KCP&L for payment of the reimbursed amounts, separate from KCP&L's claims for damages in this case. Thus, the seventh affirmative defense is unrelated to a 'claim' required to be raised before the contracting officer." Id. at 8. According to defendant, plaintiff confuses defendant's affirmative defense with "setoffs," which "relate to debts owed to the Government by contractors." Id. at 9-10. Second, defendant argues that, contrary to plaintiff's contention, defendant's seventh affirmative defense is not barred as a matter of law. Id. at 11-24. With respect to the collateral source rule, defendant contends that precedent of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") bars its application in this case and that the cases plaintiff cites are inapposite. Id. at 12-21. Specifically, defendant argues that the collateral source rule generally applies to cases involving tort damages and only applies to contract actions where there is a tortious or negligent component to the breach. Id. at 12. In addition, defendant disputes plaintiff's characterization of the government as a "wrongdoer" for purposes of applying the collateral source rule simply because the government was found to be the tortfeasor in a particular case. Id. at 14-16. With respect to plaintiff's characterization of AEGIS's payment of its settlement and litigation expenses as a remote transaction, defendant argues that plaintiff is simply wrong and that

plaintiff's recovery from AEGIS in this case is "a direct result of the alleged breach" and thus clearly not a remote transaction. Id. at 22.

Finally, defendant contends that even if the court were to strike its seventh affirmative defense, AEGIS's reimbursement of plaintiff's costs remains relevant to the calculation of plaintiff's damages. Id. at 24-25.

In its reply, plaintiff concedes that motions to strike are generally disfavored but argues that in this case, the motion should be granted because the government intentionally breached the contract, thus qualifying as a wrongdoer for purposes of applying the collateral source rule. Pl.'s Reply 3. In support of its argument, plaintiff notes that the GSA did not contest the Occupational Safety and Health Administration's ("OSHA") citation for two violations following the accident that caused Mr. Eubank's death.[3] Id. at 4-5. In addition, with respect to defendant's remoteness argument, plaintiff claims that "[t]he contract under which AEGIS reimbursed KCP&L had to do with KCP&L's liability under the settlement in the wrongful death case, not the Government's failure to indemnify KCP&L." Id. at 6. Characterizing the issue as a "public policy concern," plaintiff argues that the government should not be permitted to reduce its contractual liability by factoring in separate payments received by the nonbreaching party. Id. Lastly, plaintiff identifies two rationales for applying the collateral source rule to cases involving underlying insurance policies—first, as the wrongdoer, defendant does not deserve to benefit from plaintiff's fortuity in having obtained an insurance policy and second, any reimbursement or compensation plaintiff recovers from such a policy is "deserved" because it was provided in the contract. Id. at 7.

## 2. Analysis

### a. The Court Possesses Subject Matter Jurisdiction Over Defendant's Offset Defense

According to plaintiff, "[t]he Government failed to assert its contractual defense of offset through the contracting officer . . . , thus, the Court has no subject matter jurisdiction over the Government's affirmative defense of offset." Pl.'s Mot. 3. The court disagrees.

As stated by the Federal Circuit in Raytheon Co. v. United States, 747 F.3d 1341, 1354 (Fed. Cir. 2014), the CO need only address the "claims" presented to him, irrespective of whether they are asserted affirmatively or defensively:

> It is a bedrock principle of government contract law that contract claims, whether asserted by the contractor or the Government, must be the subject of a contracting officer's final decision. See 41 U.S.C. § 7103(a)(3) (2011). . . . Under the Contract Disputes Act, obtaining a final decision is a jurisdictional prerequisite to any

---

[3] The two violations identified in the OSHA citation were: "1. Allowing an unqualified person to have access to unguarded live electrical parts exceeding 600 volts; and 2. Not performing a hazard assessment of the building within Building 13 before assigning employees to work in that building." Pl.'s Reply 4.

>  subsequent action before a Board of Contract Appeals or the trial court.  See, e.g., Sharman Co. v. United States, 2 F.3d 1564, 1568 (Fed. Cir. 1993) ("Under the CDA, a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon."), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995) (en banc).  The purpose of this requirement is "to create opportunities for informal dispute resolution at the contracting officer level and to provide contractors with clear notice as to the government's position regarding contract claims."  Applied Cos. v. United States, 144 F.3d 1470, 1478 (Fed. Cir. 1998).  This jurisdictional prerequisite applies even when a claim is asserted as a defense.  See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1331 (Fed. Cir. 2010) (holding that a party "seeking an adjustment of contract terms must meet the jurisdictional requirements and procedural prerequisites of the [Contract Disputes Act], whether asserting the claim against the government as an affirmative claim or as a defense to a government action").

Thus, if the relief sought can properly be characterized as a claim, it must be reviewed and resolved by the CO prior to being brought before this court.  In this case, the question is whether the offset defense is a claim under the CDA that should have been asserted by defendant in the proceedings before the CO.  The answer is no.

As noted above, a CDA claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract."  FAR § 52.233-1.  Defendant's seventh affirmative defense is not an independent request for money "in a sum certain," the adjustment or interpretation of one of the electrical utility services' contract's terms, or other relief arising under the contract.  It is instead a defense that seeks to apply a monetary offset to a claim for reimbursement of monies previously paid.  Thus, defendant's failure to assert the affirmative offset defense in response to plaintiff's claims before the CO is not fatal to its ability to assert it now before this court.  See Laguna Constr. Co., Inc. v. Carter, 828 F.3d 1364, 1368 (Fed. Cir. 2016) (holding that the government's assertion of fraud as an affirmative defense before the Armed Service Board of Contract Appeals ("ASBCA") in its appeal of the CO's decision, even though the government had not previously asserted the defense before the CO, did not deny the Board jurisdiction over the appeal because the fraud defense is not a claim in that it "plainly does not seek the payment of money or the adjustment or interpretation of contract terms"); M. Maropakis Carpentry, Inc., 609 F.3d at 1331 (upholding the trial court's finding that it lacked jurisdiction over the contractor's appeal of the CO's decision because, despite the contractor's "styling of its claim as a defense to a government counterclaim for liquidated damages," the contractor's allegation that it was entitled to a time extension due to the government's delay was a claim for contract modification that had to be considered by the CO under the CDA); Total Eng'g, Inc. v. United States, 120 Fed. Cl. 10, 14-16 (2015) (holding that the court had jurisdiction over the contractor's appeal of the CO's decision

because when the contractor claimed before the CO that the government's specifications were defective—in response to the government's claim for a deductive credit—it was "not seeking an adjustment of contract terms," or "asserting its own claim for relief," but was instead "appealing and defending a Government claim").

### b. It Is Premature to Determine Whether the Collateral Source or Remote Transactions Rules Apply

Plaintiff next argues that the collateral source rule or remote transactions rule bars defendant's affirmative defense that plaintiff's damages should be offset by monies plaintiff received from another source. "The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, the profits that would have been earned but for the breach." LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003). However, "the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." Id. at 1372. In other words, the nonbreaching party cannot be put in a better position than it would have been but for the breach. Id. See generally 3 E. Allen Farnsworth, Farnsworth on Contracts 193 (2d ed. 1998) ("No matter how reprehensible the breach, damages are generally limited to those required to compensate the injured party for lost expectation, for it is a fundamental tenet of the law of contract remedies that an injured party should not be put in a better position than had the contract been performed.").

To that end, the collateral source rule provides that "collateral benefits received by the injured party do not reduce the damages owed by the wrongdoer." Id. Although the rule is most often applied in tort actions, it is sometimes considered in relation to contract cases:

> The collateral source rule arises primarily in connection with tort damages, and presupposes some wrongful act by the breaching party. This rule has been applied in connection with breach of contract, where there is a tortious or negligence component to the breach, or when the equitable balance is such that any windfall should not benefit the wrongdoer.

Id.; accord Davis v. Odeco, Inc., 18 F.3d 1237, 1243 (5th Cir. 1994) ("The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor.").

In addition to the collateral source rule, the remote transactions rule informs the way in which damages are calculated. Under the rule, as articulated by the United States Supreme Court in Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 534 (1918), a defendant may be able to offset its total damages based on plaintiff's third-party transactions as long as those transactions are not too remote. Unlike the collateral source rule, the remote transactions rule has been applied to breach-of-contract actions. For example, in LaSalle Talman Bank, F.S.B., a bank sued the United States for breach of contract following the enactment of a federal

regulation, which precluded the bank from benefitting from certain accounting practices. 317 F.3d at 1363-69. Finding that the collateral source rule did not apply because the breach was due to an act of Congress rather than any "bad faith . . . misconduct . . . [or] negligence," the Federal Circuit utilized the remote transactions rule as a means of limiting plaintiff's damage award: "Implementation of this principle requires evaluation of the remoteness, as contrasted with the proximity of ensuing events . . . , for precedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party and those that are directly related to or direct consequences of the breach." Id. at 1373; see also Hughes Commc'ns Galaxy v. United States, 38 Fed. Cl. 578, 582 (1997) ("[C]onsequential damages are not recoverable by a plaintiff suing the government for breach of contract. I.e., there are certain damages that, as a matter of law, the courts will find too remote—for example, profits lost on collateral business arrangements, or lost opportunity damages.").

In this case, by moving to strike defendant's seventh affirmative defense, plaintiff places the cart before the horse. Although plaintiff concedes that the collateral source rule (which, if applied in the instant case, would have the effect of reducing plaintiff's recovery) is traditionally applied to cases involving the commission of a tort, it nonetheless argues that the court should apply the rule to the instant contract action because defendant was clearly a wrongdoer in the underlying case. In its motion, plaintiff states:

> The Court of Federal Claims has consistently held that when the Government has breached a contract, the terms "breaching party" and "wrongdoer" are synonymous and both aptly describe the Government in such cases. . . . Given that the Government is the wrongdoer who intentionally breached the indemnity provision of the Tariff, the collateral source rule should bar the insurance offset defense to ensure that 'any windfall should not benefit the wrongdoer' as prescribed under LaSalle, for a number of reasons.

Pl.'s Mot. to Strike 6. In its reply brief, plaintiff further argues: "[T]he Government did intentionally breach a contract, in conscious and voluntary disregard of its contractual terms, leaving KCP&L to defend a wrongful death case on its own, and leaving it to pay the resulting costs and expenses." Pl.'s Reply 3. In support of its argument, plaintiff claims that defendant already conceded its liability with respect to Mr. Eubank's death:

> After an internal investigation, the Government itself concluded that the accident that caused Mr. Eubank's death in the underlying action was contributed to by a lack of security at the Hardesty Complex and also the GSA assigning Mr. Eubank a task that placed him in a potentially dangerous environment. . . . Kevin Santee, corporate representative of GSA, acknowledged receipt of the OSHA citations and acknowledged that it was necessary for GSA to modify its training protocol and admitted that the GSA accepted, and did not contest the OSHA citation. Mr. Santee also testified that he looked for and could not find any historical hazard assessments for Building 13 or the Hardesty Complex.

<u>Id.</u> at 4. Defendant, however, does not concede liability and urges the court to reject plaintiff's characterization of the government as a wrongdoer with respect to the instant breach-of-contract action. At present, discovery remains ongoing. Consequently, the court declines to render findings of fact that go to the very heart of liability.

As previously noted, plaintiff asserts two causes of action in this case—contractual indemnity and breach of contract. In Count I, plaintiff avers that (1) pursuant to the terms of the contract, the government was required to indemnify plaintiff "against all claims, losses, expenses and the like connected with the distribution or use of electrical service by the Government at or on the Government's side of the point of delivery," Compl. ¶ 60; (2) Mr. Eubank's injuries occurred on the government's side of the point of delivery; (3) plaintiff incurred a total of $4,006,138.14 to settle the underlying action brought by Mrs. Eubank; and (4) the government owes plaintiff $4,006,138.14. <u>Id.</u> ¶¶ 61-65. In Count II, plaintiff avers that (1) the parties entered into a valid contract, which contained an indemnification clause; (2) the government breached the contract by failing to defend plaintiff in the underlying action; and (3) the government owes plaintiff $4,006,138.14. <u>Id.</u> ¶¶ 67-75. In its amended answer, with respect to the factual allegations contained in these two counts, defendant either denies the averments "to the extent they are deemed allegations of fact," or denies them "for lack of knowledge or information sufficient to form a belief as to the truth of the matters asserted." <u>See</u> Am. Answer ¶¶ 57-75. Thus, contrary to plaintiff's assertions, defendant does not concede that it breached the contract or that it is a wrongdoer for purposes of analyzing plaintiff's breach of contract claim. By asking the court to strike this affirmative defense, plaintiff is, in essence, seeking resolution of the case on its merits—resolution of questions of law and perhaps disputed issues of fact, <u>see</u> <u>Reunion</u>, 90 Fed. Cl. at 581, which the court is unwilling to do at this juncture based on the record and motion before it. Thus, plaintiff's invocation of the collateral source rule is premature and does not warrant striking plaintiff's offset defense. The same is true of plaintiff's reliance on the remote transactions rule—it, too, fails to provide a basis upon which to strike defendant's affirmative defense.

### III. CONCLUSION

In sum, the court **DENIES** plaintiff's motion to strike defendant's seventh affirmative defense.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge
