# In the United States Court of Federal Claims

No. 15-348C
(Filed Under Seal:  August 9, 2018)
(Reissued for Publication:  August 30, 2018)*

```
*****************************************
KANSAS CITY POWER & LIGHT CO.,      *
                                    *
            Plaintiff,              *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
*****************************************
```

Motion to Compel; Attorney-Client
Privilege; Work-Product Doctrine; At-Issue
Waiver; Common-Interest Rule; Joint-
Defense Doctrine; Attorney's Fees

William L. Yocum, Kansas City, MO, for plaintiff.

Amanda L. Tantum, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

    In this lawsuit, plaintiff Kansas City Power & Light ("KCP&L") seeks indemnification, pursuant to a contract, from defendant for the cost of settling a wrongful death lawsuit.  The parties are currently engaged in discovery, but they have been unable to resolve some of their disputes without the court's assistance.  Currently before the court is defendant's motion to compel plaintiff to supplement its responses to various interrogatories and requests for production of documents ("request(s) for production") pursuant to Rule 37(a)(3)(B)(iv) of the Rules of United States Court of Federal Claims ("RCFC").  Defendant served discovery requests seeking information[1] regarding plaintiff's actions during the underlying wrongful death lawsuit as well as related activities following the conclusion of that matter on the theory that such information is necessary to evaluate the reasonableness of plaintiff's settlement costs and attorney's fees.  Responding to defendant's discovery requests, plaintiff withheld information on

---

    *  The court initially issued this Opinion and Order under seal with instructions for the parties to propose any redactions.  The parties informed the court that no redactions were necessary.

    [1]  Except where indicated by the context, the term "information" refers to discoverable materials contemplated by both RCFC 33 and RCFC 34.

the basis that it is protected by the attorney-client privilege or work-product doctrine.[2] Defendant seeks the production of that information on the basis that plaintiff (1) failed to establish that the withheld information is privileged and (2) waived any privilege by either putting the subject of the discovery requests at issue or sharing the requested information with a third party.  Defendant also contends that it has a substantial need for the information such that plaintiff remains obligated to produce responsive documents[3] notwithstanding the application of the work-product privilege.  For the reasons discussed below, the court grants in part and denies in part defendant's motion.

## I.  FACTS AND ALLEGED FACTS

### A.  Prior Litigation

Plaintiff alleges that, in August 1997, it" entered into a utility contract with the United States General Services Administration ("GSA ) pursuant to which plaintiff would provide electrical service to the Hardesty Federal Complex and other locations.  Plaintiff also alleges that the contract incorporated a Tariff, which included the following indemnity provision:

> Paragraph 4.12:  INDEMNITY TO [PLAINTIFF]:  [GSA] shall indemnify, save harmless and defend [plaintiff] against all claims, demands, cost or expense, for loss, damage or injury to persons or property, in any manner directly or indirectly connected with, or growing out of the distribution or use of the electric service by [GSA] at or on the [GSA]'s side of the point of delivery.

Def.'s Mot. Compel ("Def.'s Mot.") App. 39.

Plaintiff further alleges that, on August 10, 2006, David Eubank was working in one of the Hardesty Federal Complex buildings when he received burns from an arc blast.  This incident purportedly occurred at a switchgear located inside the GSA-owned building—downstream from plaintiff's point of delivery of electrical services.  Mr. Eubank died from his injuries on August 18, 2006.

Mr. Eubank's wife, on behalf of herself and her sons, filed a wrongful death lawsuit ("Eubank action") against KCP&L based on the circumstances of Mr. Eubank's death.  After the

---

[2]  Courts addressing information protected by the work-product doctrine generally use the term "work-product privilege" when discussing the application of the doctrine, see, e.g., Harkcon, Inc. v. United States, 132 Fed. Cl. 697, 704 (2017); see also United States v. Nobles, 422 U.S. 225, 238 (1975) (explaining that the doctrine "provid[es] a privileged area"), although this practice is not without controversy, see generally Sherman L. Cohn, The Work-Product Doctrine:  Protection, Not Privilege, 71 Geo. L.J. 917 (1984).  The term "work-product privilege" will be used in this opinion.

[3]  Except where indicated by the context, the term "documents" refers to discoverable materials contemplated by RCFC 34.

lawsuit was filed, KCP&L allegedly tendered the defense to the GSA, but the GSA did not undertake the defense. As a result, KCP&L retained its own counsel to defend against the claims while remaining in communication with Associate Electric & Gas Insurance Services Limited ("AEGIS"), KCP&L's excess insurer, regarding the case.[4]  On October 30, 2007, KCP&L filed a third-party petition against Mr. Eubank's supervisors—two GSA employees—seeking contribution or indemnity.  The United States substituted itself for the GSA employees and removed the case to federal court.  On April 17, 2009, the United States was dismissed from the litigation, and the case was remanded to state court.  Subsequently, KCP&L engaged in mediation with the Eubank action claimants, which included providing a mediation statement to the mediator on December 12, 2009.  KCP&L continued to engage in settlement discussions with Mrs. Eubank before agreeing to pay her $2.25 million to settle the case.  In exchange for the payment, the Eubank action claimants released all potential claims against KCP&L and any other potential defendants arising from the facts related to Mr. Eubank's death except for any right to collect future Federal Employee Compensation Act benefits.  The settlement was approved by the presiding judge on May 18, 2010.  KCP&L alleges that it incurred $1,756,138.14 in legal expenses related to the Eubank action by the time that the settlement was finalized.

After settling the case, KCP&L began the process of seeking to recoup its expenses.  In late September 2010, KCP&L requested and received reimbursement for part of its settlement and legal expenses from AEGIS.[5]  Having reached a settlement, plaintiff and AEGIS continued communicating concerning potential claims against the United States related to the Eubank action.  But on September 12, 2012, AEGIS and plaintiff entered into an agreement in which AEGIS waived any right to subrogation or reimbursement related to the Eubank action.  On February 1, 2013, plaintiff sued the United States for indemnification of the settlement costs and legal expenses related to the Eubank action.  The United States moved to dismiss plaintiff's indemnification case, which led the parties to file a joint stipulation of dismissal without prejudice because plaintiff had failed to exhaust its administrative remedies.  On or about June 25, 2014, plaintiff submitted a certified claim and request for a final decision to the GSA contracting officer.  Plaintiff sought to recover its settlement costs—the amount paid to Mrs.

---

[4]  AEGIS prepared a case summary reflecting that the insurer knew the nature of the case and was updated on the proceedings.  This case summary includes references to "we" when discussing scheduling discovery and agreeing to settle, which could suggest that AEGIS maintained an active role in the Eubank action.  But, without more information, the court cannot discern whether AEGIS controlled plaintiff's defense in the Eubank action, what AEGIS's involvement was in that case, and whether AEGIS and plaintiff agreed on coverage.

[5]  A summary prepared by AEGIS reflects that plaintiff settled for $2.25 million and incurred $1.76 million in legal expenses, but KCP&L only requested reimbursement of $3.01 million from AEGIS.  The $1 million difference between the amounts suggests that plaintiff covered some of the costs of the Eubank action.  This understanding, although not explicitly stated by the parties, is in accord with the insurance contract, see ECF No. 66-1 at 15 (explaining that the insurance company is liable for amounts in excess of the underlying limits), and plaintiff's description of AEGIS as the excess insurer, see Excess Insurer, Black's Law Dictionary (9th ed. 2009) ("An agreement to indemnify against any loss that exceeds the amount of coverage under another policy.").

Eubank and the related legal expenses.  The contracting officer denied the claim on January 27, 2015.

## B.  Current Case

A few months after the contracting officer denied plaintiff's claim, plaintiff initiated the current lawsuit giving rise to defendant's motion to compel.  Plaintiff asserts two claims—contractual indemnity and breach of contract—and seeks to recover the amount paid to settle the Eubank action as well as related legal expenses.  Since the beginning of this case, the discovery process has been contentious; the parties have asked the court to intervene in multiple disputes that the parties were unable to resolve themselves.

On November 1, 2016, defendant served on plaintiff a second set of discovery requests, which included interrogatories and requests for production.  Plaintiff provided its response on December 13, 2016.[6]  In that response, plaintiff answered the relevant (1) interrogatories by instructing defendant to see a previously produced factual synopsis of the Eubank action and (2) requests for production by stating that there were no responsive documents or directing defendant to documents produced with the synopsis.  Plaintiff also stated specific objections[7] to some of the requests and incorporated the following general objections into each answer:

- Objection A:  objecting to the time frame defendant set forth for plaintiff to respond to the extent defendant sought to impose time limits different than those imposed by the RCFC;

- Objection B:  objecting to the discovery requests to the extent they seek information protected by a prior stipulation order, confidentiality order, protective order, or any other applicable order; and

- Objection C:  objecting to the discovery requests as overbroad and unduly burdensome to the extent that defendant seeks production of all documents.

After receiving plaintiff's response, defendant sent a letter to plaintiff on January 6, 2017, stating that KCP&L's answers to the discovery requests were deficient.  Defendant explained, in detail, that plaintiff's (1) answers failed to comply with the technical requirements of the RCFC,

---

[6]  The certificate of service attached to plaintiff's response to the discovery requests reflects that the response was served on December 13, 2016.  But defendant's January 6, 2017 letter to plaintiff states the response was provided on December 12, 2016.

[7]  The court uses the term "specific objection" to refer to any objection that is neither a general objection nor an assertion of the attorney-client, settlement-communication, or work-product privilege.  Specific objections include, for example, that the requested information is irrelevant or that the request is unduly burdensome.

(2) general objections were inapplicable, and (3) specific objections to numerous requests were also inadequate.  Defendant then requested that plaintiff amend its response.[8]

Plaintiff served an amended response to defendant's discovery requests on January 20, 2017.  In the amended response, plaintiff repeated the same general and specific objections, added new factual information in response to the interrogatories, and disclosed additional documents responsive to the requests for production.

In an August 2, 2017 letter, defendant responded to plaintiff's amended response by explaining to plaintiff that its answers remained inadequate.  First, defendant wrote that plaintiff was improperly withholding responsive documents on the basis of the attorney-client or work-product privilege.  Defendant explained that plaintiff waived those privileges by (1) putting the information at issue in this case and (2) exchanging the information with AEGIS.  Even if the privileges were not waived, defendant contended that plaintiff was required to disclose work product because defendant has a substantial need for the documents and faces an undue hardship in obtaining the materials through other means.  Second, defendant explained that plaintiff's objections to Interrogatory No. 4 and Request for Production No. 10 remained inadequate for the same reasons stated in defendant's January 6, 2017 letter.  Specifically, defendant reiterated that the attorney-client and work-product privileges do not protect factual information, and the parties' equal access to information does not relieve plaintiff of the duty to respond to the discovery requests.

The record contains no evidence that plaintiff responded to this letter.  Indeed, plaintiff appears to have rested on its January 20, 2017 amended response and subsequent privilege logs.  The portions of plaintiff's amended response that defendant finds unsatisfactory, and the corresponding discovery requests, cover five topics.[9]

## 1. Defense and Indemnification Conversations With the GSA

The first area of dispute concerns plaintiff's tendering of the defense in the Eubank action to the GSA and plaintiff's requests to the GSA for indemnification of the expenses associated with that case.  Specifically, defendant asked, in Interrogatory No. 4, for plaintiff to identify "the circumstances and communications related to KCP&L's request or requests to the [GSA] for the [GSA] to defend KCP&L in the Eubank litigation and/or indemnify KCP&L for expenses related to the Eubank litigation, and the [GSA's] response or responses thereto."  Def.'s Mot. App. 8.

---

[8]  Defendant addressed the specific objections plaintiff stated in response to Request for Production Nos. 8-15, 17-20, and 22-24 as well as Interrogatory Nos. 2-8.

[9]  The parties initially briefed a dispute related to another issue—legal expenses associated with the Eubank action—but the parties stated in their January 29, 2018 joint status report that they anticipated being able to resolve the discovery issues associated with that category of information.  Although defendant noted in its supplemental reply brief that the parties have yet to resolve that discovery, the court declines to wade into the issue until the parties have clearly stated that they are at an impasse.

In its amended response, plaintiff objected to the request by stating that the interrogatory was unduly burdensome to the extent that the responsive information is equally accessible to defendant.  Plaintiff also objected to the extent that that interrogatory sought information protected by the attorney-client or work-product privilege.  Notwithstanding these objections, plaintiff stated that it timely notified the GSA of the Eubank action and requested that the GSA defend, indemnify, and hold harmless plaintiff for defense costs and potential liability determinations.  Plaintiff also explained that (1) the GSA refused to defend plaintiff after it tendered the defense and (2) plaintiff again demanded indemnification from GSA on January 21, 2014.

## 2.  Analysis of the Eubank Action Claims

The second area of dispute encompasses plaintiff's analysis of the Eubank action and specifically concerns Request for Production Nos. 19 and 20.  In Request for Production No. 19, defendant requested "[a]ll documents related to the analysis of litigation strategy related to the Eubank litigation, the Eubank plaintiffs' claims, and/or settlement of the Eubank litigation conducted by" plaintiff, AEGIS, and/or their experts, consultants, or counsel.  Id. at 12.  In the relevant portion of Request for Production No. 20, defendant asked for "[a]ll communications between AEGIS (and its attorneys, consultants, and representatives) and KCP&L (and its attorneys, consultants, and representatives) related to . . . litigation strategy in the Eubank litigation, the Eubank plaintiffs' claims, and/or settlement of the Eubank litigation."  Id.  In its amended response, plaintiff answered both requests by incorporating its general objections and objecting to the requests because defendant sought "documents and/or communication[s] covered by the attorney-client privilege or the work product [privilege]."  Id. at 51-52.  Plaintiff did not produce any documents.  Id.

Unsurprisingly, the new response did not satisfy defendant's concerns.  In a February 23, 2017 letter, defendant responded to plaintiff's lack of production by stating that KCP&L (1) failed to explain with specificity why the requests were unduly burdensome and (2) waived the attorney-client and work-product privileges.  Plaintiff replied in a March 3, 2017 letter to defendant that KCP&L was withholding documents based on the attorney-client and work-product privileges.  Plaintiff identified the withheld documents in a March 3, 2017 privilege log ("March 2017 Privilege Log") included with the letter as well as in a May 22, 2017 privilege log ("May 2017 Privilege Log") later provided to defendant.[10]

Of particular importance to the pending motion, plaintiff identified in those privilege logs a document authored by plaintiff's counsel and sent to AEGIS's counsel that is responsive to Request for Production Nos. 19 and 20 (among others).  Defendant states, and plaintiff does not dispute, that this document shares the same characteristics as a previously produced electronic-

---

[10]  The two privilege logs are similar; in the May 2017 Privilege Log, plaintiff omitted some entries that had appeared in the March 2017 Privilege Log, identified some new documents that were being withheld, and amended the descriptions of some previously identified documents.

mail ("e-mail") message.[11]  Specifically, defendant notes that the e-mail message and the document identified on the privilege logs have the same date (January 5, 2010), author (Diana Beckman), and recipient (Shannon Ali).[12]

### 3. Settlement Activities

The third area of dispute pertains to plaintiff's settlement activities in the <u>Eubank</u> action and specifically concerns Interrogatory No. 8 as well as Request for Production Nos. 14 and 18. In Interrogatory No. 8, defendant asked plaintiff to "state in detail the circumstances surrounding the settlement activities conducted and the settlement entered into to resolve the <u>Eubank</u> plaintiffs' claims in the <u>Eubank</u> litigation . . . ." <u>Id.</u> at 10.  Associated with that interrogatory is Request for Production No. 14, in which defendant requested "[a]ll documents relied upon to answer Interrogatory No. 8." <u>Id.</u> at 11.  In its amended response to these discovery requests, plaintiff incorporated its general objections and also objected on the basis that the interrogatory was unduly burdensome, overly broad, and sought information that is neither relevant nor likely to lead to the discovery of admissible evidence.  Furthermore, plaintiff objected to the interrogatory because defendant requested information that was disclosed in answers to previous requests for admission.  Plaintiff also asserted that the interrogatory sought information covered by the attorney-client or work-product privilege.  After stating these objections, plaintiff (1) answered Interrogatory No. 8 by explaining that KCP&L reached a settlement with the <u>Eubank</u> action claimants following mediation and (2) responded to Request for Production No. 14 by producing some documents.

As noted above, plaintiff served its amended response with a letter clarifying KCP&L's position regarding the discovery requests.  In the relevant portion of the letter, plaintiff wrote that it "withheld documents and information protected by the attorney client privilege in response to Interrogatory No. 8 and Request for Production No. 14." <u>Id.</u> at 59.  In a February 23, 2017 letter, defendant responded to both the amended response and the corresponding letter asking whether plaintiff was withholding information based on objections other than privilege.  In its letter, defendant reiterated a point it previously made in response to plaintiff's initial answer to Interrogatory No. 8 and Request for Production No. 14:  KCP&L waived the attorney-client and work-product privileges by placing the reasonableness of the settlement and attorney's fees at issue.  Plaintiff replied on March 3, 2017, that it was withholding information responsive to Request for Production No. 14 based on the attorney-client or work-product privilege.  On the same day, plaintiff provided defendant with the March 2017 Privilege Log identifying a responsive document, which was also identified in the May 2017 Privilege Log.

---

[11]  Plaintiff did not address the purported similarity despite defendant repeatedly stressing the importance of the similarity.  In this context (and for the purposes of this motion only), the court treats plaintiff's silence as agreement that the disclosed document is the same document as the one identified on the privilege logs.

[12]  Although the disclosed e-mail message includes additional recipients in the carbon copy line, the court cannot discern whether the privilege log's recipient line is intended to show any carbon copy line recipients.  But, as discussed above, plaintiff's silence on the issue is telling.  <u>See</u> <u>supra</u> note 11.

In Request for Production No. 18, defendant requested "[a]ll documents and/or communications related to the settlement in the Eubank litigation, including, but not limited to, the settlement agreement." Id. at 12.  In response, plaintiff incorporated its general objections as well as its specific objection that defendant sought documents protected by the attorney-client or work-product privilege.

### 4. Reasonableness of the Settlement Decision

The fourth area of dispute encompasses defendant's request for information related to whether plaintiff made a reasonable decision to settle.  This area specifically concerns Interrogatory No. 3 and the related Request for Production No. 9.  In Interrogatory No. 3, defendant asks plaintiff to "state in detail all of the factual bases for KCP&L's claims . . . that 'KCP&L made a reasonable business decision to settle' the Eubank matter 'for $2,250,000.00' . . . ." Id. at 8.  In Request for Production No. 9, defendant asked for all documents plaintiff relied on to answer Interrogatory No. 3.  In its amended response, plaintiff objected on the basis that Interrogatory No. 3 was unduly burdensome and contained six discrete interrogatories. Nonetheless, plaintiff answered the relevant portion of Interrogatory No. 3 by stating that "[t]he reasonable decision to settle the Eubank case was based upon the facts of the underlying case and consideration of those facts in light of the law." Id. at 35.  Plaintiff also provided details on other factors that it deemed relevant, including the mediation proceeding; contract between plaintiff and the GSA; and facts, discovery, expert witnesses, and expert materials in the Eubank action. Responding to Request for Production No. 9, plaintiff incorporated its general objections and those objections lodged in response to Interrogatory No. 3.  Plaintiff, however, produced some documents.

Plaintiff fleshed out its answers to the above discovery requests in the letter sent to defendant with plaintiff's amended response.  Plaintiff stated in the letter that it "will not include any documents that are attorney work product or which contain attorney client privileged information." Id. at 58.  Plaintiff continued:  "As a result, documentation supporting [plaintiff's] reasonable business decision to settle the Eubank matter includes the factual basis for this reasonable business decision, which necessarily includes all the facts of the underlying case." Id. In its February 23, 2017 letter to plaintiff, defendant responded that plaintiff waived any privileges by putting the reasonableness of the settlement decision at issue in this case.  Plaintiff replied, in its March 3, 2017 letter, that it was continuing to withhold relevant information covered by the attorney-client or work-product privilege, which is reflected in plaintiff's March 2017 Privilege Log and May 2017 Privilege Log.

### 5. Post-Eubank Action Claims

The fifth area of dispute concerns the claims plaintiff submitted to the contracting officer and this court after the conclusion of the Eubank action.  Defendant seeks information regarding these claims in Interrogatory No. 7 as well as Request for Production Nos. 13, 15, and 20.  In Interrogatory No. 7, defendant asked plaintiff to "[s]tate in detail all the circumstances surrounding the preparation of plaintiff's Claim" submitted to the contracting officer. Id. at 9. Associated with this interrogatory is Request for Production No. 13, in which defendant

requested "[a]ll documents relied upon to answer Integratory No. 7." Id. at 11.  Relatedly, defendant used Request for Production No. 15 to request "[a]ll documents and/or communications related to the preparation and submission . . . of the Claim" submitted to the contracting officer.  Id.  Building on this request, defendant used the relevant part of Request for Production No. 20 to ask plaintiff for "[a]ll communications" between AEGIS and plaintiff "related to . . . [the claim] submitted by KCP&L to the contracting officer and the claims brought before [this court] in Case No. 13-86C and Case No. 15-348C . . . ."  Id. at 12.

Plaintiff listed a variety of objections to these requests in its amended response.  In response to Interrogatory No. 7, plaintiff incorporated its general objections and further objected on the basis that the interrogatory sought information that is "neither relevant nor likely to lead to the discovery of admissible evidence."  Id. at 45.  Plaintiff then answered that its counsel and representative prepared the claim submitted to the contracting officer and did not include details regarding reimbursement because KCP&L's contract with the GSA provided an unqualified right to indemnification.  Turning to Request for Production No. 13, plaintiff produced some documents after incorporating its general objections as well as those objections noted in response to Interrogatory No. 7.  Plaintiff answered Request for Production No. 15 by incorporating its general objections and disclosing some documents.  Plaintiff then responded to the relevant part of Request for Production No. 20 by incorporating its general objections and objecting on the basis that the request sought documents protected by the attorney-client or work-product privilege.  Plaintiff did not produce any responsive documents.

Plaintiff expanded on its answers in the letter accompanying KCP&L's amended response.  With regard to Request for Production No. 15, plaintiff said it was unable to adequately respond until defendant tailored its requests.  Plaintiff also stated in the letter that defendant sought documents through Request for Production No. 20 that are protected by the attorney-client or work-product privilege.  In its February 23, 2017 letter, defendant stated that plaintiff's unduly burdensome objections to Request for Production Nos. 15 and 20 lack the requisite specificity.  Defendant also noted that it previously argued that plaintiff waived any privileges by placing the contents of the documents at issue and that plaintiff did not address the argument.  In its March 3, 2017 letter to defendant, plaintiff explained that it was withholding responsive documents to Request for Production Nos. 13, 15, and 20 based on the attorney-client or work-product privilege.[13]  On the privilege log included with the letter, plaintiff identified the withheld documents.

## II.  LEGAL STANDARDS

It is "axiomatic that a trial court has broad discretion to fashion discovery orders . . . ." White Mountain Apache Tribe of Ariz. v. United States, 4 Cl. Ct. 575, 583 (1984); see also Schism v. United States, 316 F.3d 1259, 1300 (Fed. Cir. 2002) ("A trial court 'has wide discretion in setting the limits of discovery.'" (quoting Moore v. Armour Pharm. Co., 927 F.2d 1194, 1197 (11th Cir. 1991))); Florsheim Shoe Co., Div. of Interco, Inc. v. United States, 744

---

[13]  By stating that privileged documents responsive to Request for Production No. 13 were being withheld, plaintiff also suggested for the first time that it was withholding information on the same basis from the related interrogatory—Interrogatory No. 7.

F.2d 787, 797 (Fed. Cir. 1984) ("Questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court."). Although discovery rules "are to be accorded a broad and liberal treatment," Hickman v. Taylor, 329 U.S. 495, 507 (1947), the court must, "[i]n deciding either to compel or quash discovery, . . . balance potentially conflicting goals," Evergreen Trading, LLC ex rel. Nussdorf v. United States, 80 Fed. Cl. 122, 126 (2007). Thus, "discovery, like all matters of procedure, has ultimate and necessary boundaries." Hickman, 329 U.S. at 507.

## A.  Scope of Discovery

RCFC 26(b)(1), which is identical to Rule 26(b)(1) of the Federal Rules of Civil Procedure ("FRCP"),[14] is the general provision governing the scope of discovery in the United States Court of Federal Claims. Sparton Corp. v. United States, 77 Fed. Cl. 10, 21 n.14 (2007). The scope of discovery is broad. Int'l Paper Co. v. United States, 36 Fed. Cl. 313, 317 (1996); accord FRCP 26(b) advisory committee's note to 1946 amendment ("The purpose of discovery is to allow a broad search for facts . . . or any other matters which may aid a party in the preparation of presentation of his case."). The range of permissible discovery includes more than just evidence that would be admissible at trial; parties may obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." RCFC 26(b)(1).

But a party's ability to obtain pretrial discovery is not unrestrained. The court may limit a discovery request that is unduly burdensome—i.e., the "burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." RCFC 26(b)(2)(C)(iii). Under RCFC 26, the parties also may limit the scope of discovery by withholding otherwise discoverable information by claiming that it is protected by the attorney-client or work-product privilege. RCFC 26(b)(5)(A). Pursuant to that rule, however, the party withholding information on the basis of the attorney-client or work-product privilege must "(i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Id. In other words, "the description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements" of the claimed privileges "have been established." Deseret Mgmt. Corp. v. United States, 76 Fed. Cl. 88, 91 (2007) (quoting SmithKline Beecham Corp. v. Apotex Corp., 232 F.R.D. 467, 475 (E.D. Pa. 2005)); accord FRCP 26(b) advisory committee's note to 1993 amendment ("The party must . . . provide sufficient information to enable other parties to evaluate the applicability of the claimed privilege or protection.").

---

[14] "[T]o the extent practicable," the RCFC conform to the FRCP. RCFC rules committee's note to 2008 amendment. Thus, "interpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the [FRCP]." RCFC rules committee's note to 2002 amendment; accord Zoltek Corp. v. United States, 71 Fed. Cl. 160, 167 (2006).

## 1. Attorney-Client Privilege

The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Thus, the privilege "protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice." Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997). This privilege extends only to communications and not to any underlying factual information in those communications. Upjohn Co., 449 U.S. at 389. Furthermore, information "does not become privileged simply because it came from counsel"; indeed, "when documents or conversations are created pursuant to business matters, they must be disclosed." Energy Capital Corp. v. United States, 45 Fed. Cl. 481, 484 (2000).

Because "the privilege has the effect of withholding relevant information from the fact finder, [the privilege] applies only where necessary to achieve its purpose." Fisher v. United States, 425 U.S. 391, 403 (1976); see also Energy Capital Corp., 45 Fed. Cl. at 484 ("The assertion of privileges is strictly construed."). Consequently, the assertion of attorney-client privilege is only proper when:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Energy Capital Corp., 45 Fed. Cl. at 484-85 (quoting United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950)). The party asserting the privilege bears the burden of demonstrating the applicability of the privilege, and that burden is not "discharged by mere conclusory or ipse dixit assertions." Evergreen Trading, 80 Fed. Cl. at 127 (quoting In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)); see also In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 450-51 (6th Cir. 1983) (reviewing decisions from various appellate courts on which party bears the burden).

Even if the privilege would otherwise be applicable, the party holding the privilege may waive it with regard to specific information. In re Seagate Tech., LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007) (en banc). Given this possibility, "the party who invokes the privilege bears the burden of establishing that . . . it has not been waived" via an implied or express waiver. In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003); accord Weil v. Inv./Indicators, Research & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir.

1981) ("One of the elements that the asserting party must prove is that it has not waived the privilege."). Waiver can be accomplished in several ways. For example, a party may implicitly waive the privilege if the communication is necessary to establish its claim. Blue Lake Forest Prods., Inc. v. United States, 75 Fed. Cl. 779, 783 (2007). This waiver is commonly known as the "at-issue waiver" or "at-issue implied waiver." See, e.g., id. at 783-84 (using both terms). In addition, an intentional waiver can be implied from a party's failure to seek the return of privileged documents that were previously produced. Oasis Int'l Waters, Inc. v. United States, 110 Fed. Cl. 87, 116 (2013); see also Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1350 (Fed. Cir. 2005) ("A party's failure to protect its privilege can result in a loss of that privilege"). Further, "[a] client may expressly waive the privilege with respect to a confidential communication by disclosing the communication to a third party." Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. 480, 501 (2009).

"If a court determines that a party has waived the privilege with respect to a particular communication, that waiver generally extends to all communications 'relating to the same subject matter.'" Oasis Int'l Waters, 110 Fed. Cl. at 109 (quoting Fort James Corp., 412 F.3d at 1349). This rule "is grounded in principles of fairness," In re Seagate Tech., 497 F.3d at 1372, which helps explain why the contours of a subject matter waiver depend on the circumstances giving rise to the original waiver, see Oasis Int'l Waters, 110 Fed. Cl. at 109.

If the waiver-inducing disclosure is made during a federal proceeding (or to a federal office or agency), then the waiver extends to undisclosed information if "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." Fed. R. Evid. 502(a). First, as noted above, intentional waivers can be express or implied. See Oasis Int'l Waters, 110 Fed. Cl. at 109; Eden Isle Marina, 89 Fed. Cl. at 501; see also Fort James, 412 F.3d at 1350. Second, as to determining subject matter, "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." Fort James, 412 F.3d at 1349. Third, the fairness inquiry requires a consideration of whether "further disclosure of related, protected information" is necessary "to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502(a) advisory committee's note (2007); see also In re EchoStar Commc'ns Corp., 448 F.3d 1294, 1303 (Fed. Cir. 2006) (noting that the "overarching goal" of subject matter waiver is "to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege to unfavorable advice").

If the waiver-inducing disclosure is not made to a federal office or agency, "it is unresolved whether 'Rule 502(a) [of the Federal Rules of Evidence ("FRE")] governs the scope of waiver resulting from . . . pre litigation disclosure.'" Oasis Int'l Waters, 110 Fed. Cl. at 109 (alteration in original) (quoting Wi-LAN v. Kilpatrick Townsend & Stockton LLP, 684 F.3d 1364, 1369 (Fed. Cir. 2012)); see also Fed. R. Evid. 502(a) (explaining the rule applies "when the disclosure is made in a federal proceeding or to a federal office or agency"). In circumstances not explicitly contemplated by FRE 502(a), the weight of authority suggests that the scope of subject matter waivers are premised on fairness considerations akin to those

required by the evidentiary rule.  Oasis Int'l Waters, 110 Fed. Cl. at 115; see also Wi-LAN, 684 F.3d at 1373 (predicting that another appellate court would appreciate "the heavy weight of current authority that comes down on the side of employing fairness considerations to decide the scope of waivers").

## 2. Work-Product Privilege

In contrast with the attorney-client privilege, the work-product privilege protects against the discovery of documents "prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, . . . or agent)." RCFC 26(b)(3)(A); see also Upjohn Co., 449 U.S. at 398 ("Rule 26(b)(3) codifies the work-product privilege . . . ."). Specifically, the privilege "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Nobles, 422 U.S. at 238. By "protecting 'the attorney's thought processes and legal recommendations' from the prying eyes of his or her opponent," the privilege "promotes a fair and efficient adversarial system . . . ." In re EchoStar Commc'ns Corp., 448 F.3d at 1301 (quoting Genentech, 122 F.3d at 1415). Given these constraints, the work-product privilege does not protect "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes . . . ." FRCP 26(b)(3) advisory committee note to the 1970 amendment. As with the attorney-client privilege, the party asserting the work-product privilege bears the burden of demonstrating that the privilege applies and was not waived, Evergreen Trading, 80 Fed. Cl. at 127, and must do so by setting forth objective facts supporting the claim rather than mere conclusory statements, AAB Joint Venture v. United States, 75 Fed. Cl. 448, 455 (2007).

The fact that documents may have been created in anticipation of litigation or for trial does not always create an impenetrable barrier for another party seeking to obtain the materials through discovery. A party can waive the work-product privilege either expressly or implicitly in generally the same manner that a party can waive the attorney-client privilege. See Eden Isle Marina, 89 Fed. Cl. at 503-04. As with the attorney-client privilege, a party who discloses work-product documents risks a subject matter waiver. In re EchoStar Commc'ns Corp., 448 F.3d at 1302; see also FRE 502(a). The court, however, must "pay close attention to the special protection afforded [to] opinion work product" before recognizing the scope of a subject matter waiver as encompassing such work product. Eden Isle Marina, 89 Fed. Cl. at 505. Even if there is no waiver, documents that would otherwise be protected by the work-product privilege are discoverable in limited circumstances. Specifically, documents prepared in anticipation of litigation may be discovered if the requesting party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." RCFC 26(b)(3)(A). The degree of need and hardship that a party must show, however,

> depends on whether the work product is factual, or the result of
> mental processes such as plans, strategies, tactics, and impressions,
> whether memorialized in writing or not. Whereas factual work
> product can be discovered solely upon a showing of substantial

> need and undue hardship, mental process work product is afforded
> even greater, nearly absolute, protection.

In re Seagate Tech., 497 F.3d at 1375; accord RCFC 26(b)(3)(B) ("If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.").

### 3. Joint-Defense Privilege and Common-Interest Rule

Also at issue in this case is a concept referred to as both the joint-defense privilege and the common-interest rule. The joint-defense privilege and common-interest rule are different names for the same concept.[15] See, e.g., In re SoftWire Technology, LLC, 135 F. App'x 422, 422 n.* (Fed. Cir. 2005) ("The joint defense privilege is also known as the common interest privilege"); In re Grand Jury Subpoena, 274 F.3d 563, 572 (1st Cir. 2001) (similar). The court will use the term "common-interest rule" because it is more accurate. See In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129, 902 F.2d 244, 249 (4th Cir. 1990) (explaining that the "common-interest rule" is a more accurate term because courts have expanded the joint-defense privilege beyond codefendants); accord United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) ("The joint defense privilege . . . [is] more properly identified as the 'common interest rule' . . . .").

The common-interest rule is "designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other" without making shared information discoverable. In re Pac. Pictures Corp., 679 F.3d 1121, 1129 (9th Cir. 2012). Specifically, the rule is an exception to the principle that a party waives the attorney-client or work-product privilege by sharing the protected information with a third party. John Doe 89-129, 902 F.2d at 249. The "rule presupposes the existence of an otherwise valid" assertion of privilege. Id.; see also In re Pac. Pictures Corp., 679 F.3d at 1129 (noting that the rule is not a separate privilege). To preclude a waiver of those privileges, the common-interest rule requires that (1) the parties who exchanged information did so in the context of a joint effort regarding a common interest and (2) the exchange was made in furtherance of that interest. Schwimmer, 892 F.2d at 243; accord United States v. BDO Seidman, LLP, 492 F.3d 806, 815 (7th Cir. 2007).

With regard to first prong of the rule, "[t]he key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." B.E. Meyers & Co., Inc., 41 Fed. Cl. at 732 (quoting Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1172 (D.S.C. 1974)); accord Lugosch v. Congel, 219 F.R.D. 220, 238 (N.D.N.Y. 2003) ("The common enterprise must be for a legal purpose, and not solely commercial, although it may

---

[15] The correct terminology is a matter of dispute. See, e.g., JTR Enters., LLC v. An Unknown Quantity of Colombian Emeralds, Amethysts & Quartz Crystals, 297 F.R.D. 522, 528 (S.D. Fla. 2013) (using the terms "joint-defense doctrine" and "common-interest privilege"); B.E. Meyers & Co. v. United States, 41 Fed. Cl. 729, 732 & n.4 (1998) (noting that courts interchangeably use the terms "joint-defense doctrine," "common-interest doctrine," and "community-of-interest doctrine").

possibly serve both purposes.").  Although a shared legal interest satisfies the first prong, it is not sufficient for the second; to satisfy the second prong of the rule, "the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement— whether written or unwritten."  In re Pac. Pictures Corp., 679 F.3d at 1129; accord Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) ("Sharing a desire to succeed in an action is not enough to create a common interest . . . .").  Indeed, a shared desire to prevail in a case "is not enough to create a common interest where there was no evidence of an agreement, the third-party was never party to the action, and the third-party never exercised control over or contributed to legal expenses."  JTR Enters., LLC, 297 F.R.D. at 528.

## B.  Methods of Discovery

In addition to the various standards governing the scope of discovery, this case involves two methods of discovery:  interrogatories and requests for production.  RCFC 33 governs interrogatories.  "An interrogatory may relate to any matter that may be inquired into under RCFC 26(b)."  RCFC 33(a)(2).  After being served with interrogatories, the responding party has thirty days to submit its answers and any objections.  RCFC 33(b)(2).  If the responding party objects to an interrogatory, the "grounds for objecting . . . must be stated with specificity" and "[a]ny ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure."  RCFC 33(b)(3)-(4).

The production of documents is governed by RCFC 34.  Subject to the limits of permissible discovery set forth in RCFC 26(b), a party may serve on another party a request "to produce and permit the requesting party to inspect . . . any designated documents or electronically stored information . . . ."  RCFC 34(a)(1).  The party to whom the request is directed "must respond in writing within 30 days after being served," but "[a] shorter or longer time may be stipulated to under RCFC 29 or be ordered by the court."  RCFC 34(b)(2)(A).  Each response "must either state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons."  RCFC 34(b)(2)(B).  If a responding party objects, the "objection must state whether any responsive materials are being withheld on the basis of that objection."  RCFC 34(b)(2)(C).  The failure to make a proper objection to a document production request may result in the waiver of that objection.  See Marx v. Kelly, Hart & Hallman, P.C., 929 F.2d 8, 12 (1st Cir. 1991) ("If the responding party fails to make a timely objection, or fails to state the reason for an objection, he may be held to have waived any or all of his objections.").

## C.  Motion to Compel

When a party is dissatisfied with the responses to its discovery requests, the party may seek an order from the court compelling a more satisfactory response.  Specifically, under RCFC 37, when a party fails to fulfill its discovery obligations, the "party seeking discovery may move for an order compelling an answer, designation, production, or inspection."  RCFC 37(a)(3)(B). A motion to compel is appropriate when a party "fails to answer an interrogatory under RCFC

33" or "fails to respond that inspection will be permitted—or fails to permit inspection—as requested under RCFC 34."  RCFC 37(a)(3)(B).

"In order to succeed on a motion to compel discovery, a party must first prove that it sought discovery from its opponent."  Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1310 (3d Cir. 1995).  Additionally, an RCFC 37 motion "must include a certification that the movant has in good faith conferred or attempted to confer" with the nondisclosing party regarding the discovery request.  RCFC 37(a)(1).  Similar to its FRCP counterpart, RCFC 37 "does not set forth what must be included in the moving party's certification except to indicate that the document must declare that the movant has 'in good faith conferred or attempted to confer' . . . ."  Shuffle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 171 (D. Nev. 1996).  "[G]ood faith cannot be shown merely through the perfunctory parroting of statutory language on the certificate to secure court intervention; rather it mandates a genuine attempt to resolve the discovery dispute through non judicial means."  Id.  Conferment, in turn, requires that the "moving party must personally engage in two-way communication with the nonresponding party to meaningfully discuss each contested discovery dispute in a genuine effort to avoid judicial intervention."  Id.

After resolving a motion to compel, RCFC 37 contemplates the court ordering the payment of expenses incurred as a result of the motion and issuing a protective order when warranted.  See RCFC 37(a)(5).  If the court grants the motion (or the requested discovery is provided after the motion is filed), then the court must require the responding party to pay the moving party's reasonable expenses (including attorney's fees) incurred in making the motion.  RCFC 37(a)(5)(A).  But such an award is not appropriate if:

> (i)  the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

> (ii)  the opposing party's nondisclosure, response, or objection was substantially justified; or

> (iii)  other circumstances make an award of expenses unjust.

Id.  If the court denies the motion, however, the court (1) may issue a protective order and (2) must require the moving party to pay the responding party's reasonable expenses incurred in opposing the motion unless "the motion was substantially justified or other circumstances make an award of expenses unjust."  RCFC 37(a)(5)(B).  Finally, if the court grants in part and denies in part the motion, then the court may issue a protective order and apportion reasonable expenses for the motion.  RCFC 37(a)(5)(C).

## III. ANALYSIS

After requesting discovery from plaintiff and then making a good-faith effort to obtain satisfactory responses, defendant filed the instant motion to compel.  Specifically, defendant moves to compel plaintiff's responses to various discovery requests that were answered with general objections; specific objections; and assertions of the attorney-client, settlement-

communication, and work-product privileges.  Defendant argues that (1) the general and specific objections are insufficient to warrant withholding information; and (2) the asserted privileges do not apply, were implicitly waived, or were expressly waived.  In addition, assuming its motion is granted, defendant seeks an adverse inference if plaintiff declines to supplement its discovery responses.

## A.  General and Specific Objections

Turning to the information that defendant knows was withheld due to entries on the privilege log, the court begins by analyzing plaintiff's general and specific objections to the discovery requests because the validity of these objections would render moot any dispute over assertions of privilege.  These objections can be sustained only if they are stated with specificity and tailored to the disputed discovery requests.  RCFC 33(b)(4); RCFC 34(b)(2)(B).  The use of broad or boilerplate objections is insufficient to justify withholding information.  Cf. Lakeland Partners, L.L.C. v. United States, 88 Fed. Cl. 124, 133 (2009) ("[B]road allegations of harm, unsubstantiated by specific examples, are insufficient to justify issuance of a protective order.").

The court will not sustain plaintiff's general objections because they consist of broad, boilerplate language relatively untethered to the facts of the case.  Objection A is overruled because plaintiff fails to show that defendant's discovery requests include obligations or deadlines for responding that conflict with those set forth in the RCFC.  Similarly, objection B is overruled because plaintiff fails to demonstrate the existence of an order or agreement limiting discovery.  As with the previous two objections, objection C appears to be boilerplate language, albeit slightly more germane to the discovery responses in this case given that defendant actually requests "all" documents in certain instances.  Nonetheless, objection C is overruled because plaintiff fails to demonstrate that a request for "all" documents pertaining to specific information in a relatively narrowly tailored time frame is overly broad or unduly burdensome.[16]  The decision to overrule these general objections is reinforced by plaintiff's failure to respond to defendant's arguments regarding the general objections despite bearing the burden of showing that the objections are meritorious.  See Cardiosom, LLC v. United States, 91 Fed. Cl. 659, 664 (2010) (noting that when a plaintiff fails to respond to an argument, the plaintiff "has effectively conceded the issue"); Ravens Grp., Inc. v. United States, 79 Fed. Cl. 100, 110 (2007) (similar).

Although slightly more tailored and composed with slightly less boilerplate language, plaintiff's specific objections to the discovery requests at issue also do not justify withholding information.  Similar to the general objections, defendant makes colorable arguments regarding why these specific objections are inadequate, and plaintiff has not responded to the arguments.  The court is inclined to agree with defendant's position given plaintiff's lack of specificity.  A

---

[16]  The requests for production in which defendant asks for "all" documents appear especially appropriate in this case given that the requests at issue are tailored to discrete categories of information that would not be meaningfully addressed by a sampling of responsive documents.  Anything less than a request for "all" documents would invite plaintiff to selectively disclose information while technically complying with the discovery request.

more expansive critique of the merits of each objection is not warranted given that plaintiff abandons the specific objections in its briefing.  See Cardiosom, 91 Fed. Cl. at 664.  Therefore, the court overrules plaintiff's specific objections to the discovery requests addressed in defendant's motion.  Accordingly, plaintiff's right to withhold information responsive to defendant's discovery requests turns on the viability of the claimed privileges.

## B.  Privilege Logs

As an initial matter, defendant expresses concern that plaintiff's privilege logs reflect only some of the documents being withheld based on assertions of privileges.  This belief has merit given plaintiff's admission that it was not listing all responsive documents on its privilege logs, see Pl.'s Supp. Resp. 3 (suggesting that plaintiff did not identify documents if other objections were applicable), argues that there is no obligation to do so, id. at 2-3, and identified only one document sent to AEGIS during the Eubank action despite other records suggesting ongoing communications during that time,[17] compare Def.'s Reply App. 2-3 (noting communication between plaintiff and AEGIS), with Def.'s Mot. App. 91-93 (noting one privileged document reflecting communication between plaintiff and AEGIS during the Eubank action).  Because plaintiff's nonprivilege objections were not sustained, plaintiff is obligated to identify any materials being withheld on the basis of privilege.  See RCFC 26(b)(5)(A) (requiring a party identify information that is being withheld on the basis of privilege when the materials are otherwise discoverable).  In light of the information before the court, plaintiff is ordered to either (1) supplement its privilege logs with any withheld documents responsive to defendant's second set of discovery requests or (2) provide defendant with a sworn statement averring that the most recent privilege log reflects plaintiff's good-faith effort to identify all such documents.

## C.  Applicability of the Work-Product Privilege and the Attorney-Client Privilege

The first step in ascertaining the viability of the privileges asserted by plaintiff is determining whether the privileges apply to the designated documents in the first instance.  Defendant challenges plaintiff's assertion of privilege in three respects.

### 1.  Work Product Created After the Eubank Action

Defendant first argues that the work-product privilege does not allow plaintiff to avoid substantively responding to discovery requests related to events that occurred after the Eubank action.  Specifically, defendant contends that the privilege is inapplicable because plaintiff has not established that, after the conclusion of the Eubank action, "there was a 'substantial probability that litigation will occur and that commencement of such litigation is imminent.'" Def.'s Mot. 34 (quoting Home Ins. Co. v. Ballenger Corp., 74 F.R.D. 93, 101 (N.D. Ga. 1977)).  Defendant's argument rests on the fact that plaintiff waited for more than two years after the conclusion of the Eubank action to sue the government.

---

[17]   The paucity of records identified as privileged takes on increased significance because plaintiff asserts that it was communicating with AEGIS regarding legal strategy, which suggests that plaintiff might possess additional potentially privileged documents.

The work-product privilege, as explained above, protects documents that are "prepared in anticipation of litigation . . . ." RCFC 26(b)(3)(A). Relying on nonbinding precedent from outside the court's jurisdiction, defendant urges a narrow reading of what it means to be prepared in anticipation of litigation: a substantial probability of imminent litigation. But such a reading is not in accord with the standard used by this court. See Evergreen Trading, 80 Fed. Cl. at 132 ("[I]t is well-recognized that for the [work-product privilege] to apply, litigation need not . . . be imminent . . . ." (second alteration in original)). Under this standard, documents are created in anticipation of litigation when (1) the litigation was "a real possibility at the time the documents in question [were] prepared" and (2) a "given document was prepared or obtained 'because of' [that possibility]." Id. (collecting cases).

Applying that standard, the application of the work-product privilege to prelitigation documents is not foreclosed by the delay between the conclusion of the Eubank action and the current case. Plaintiff faced a real possibility of litigation regarding the government's purported indemnification obligation from the moment the GSA declined to pay the settlement costs in the Eubank action (if not earlier, such as when the government purportedly declined to defend plaintiff in the case). Once the GSA did not fulfill its purported obligation under the indemnity agreement, plaintiff was aware that it would have to file suit against the government to enforce its rights, and the entries on the relevant privilege logs reflect that the documents were shared because plaintiff anticipated pursuing such litigation. E.g., Def.'s Mot. App. 92 (describing subject matter of document as "communication related to pursuing anticipated litigation").

## 2. Work Product and Factual Information

Next, based on plaintiff's assertion of the work-product privilege in response to Interrogatory Nos. 4 and 8, defendant speculates that plaintiff improperly withheld responsive factual information. Defendant argues that the court should compel plaintiff to provide any withheld facts because the work-product privilege does not shield facts from disclosure in response to discovery requests. Plaintiff does not directly respond to this argument.

Defendant is correct that the work-product privilege "does not protect facts contained within or underlying attorney work product."[18] AAB Joint Venture, 75 Fed. Cl. at 454. With regard to Interrogatory No. 4, plaintiff omitted relevant factual information concerning KCP&L's overtures to the GSA tendering the defense or requesting indemnification. For example, plaintiff answered that it twice contacted the GSA regarding indemnification but did not include details regarding how the requests were made or, for the first request, when it was made.[19] That information is relevant because verifying the tender might change the standard for

---

[18] Defendant notes that it has asked plaintiff if it entered into a confidentiality agreement governing the mediation proceeding and asserts that plaintiff has not responded to that inquiry.

[19] In relevant part, plaintiff stated: "KCP&L timely notified the [GSA] of the [Eubank action]. KCP&L requested that the [GSA] defend, indemnify, and hold KCP&L harmless for defense costs and potential liability determination . . . . On January 21, 2014, KCP&L again demanded indemnification from the [GSA]." Def.'s Mot. App. 43.

evaluating plaintiff's settlement.  See Weissman v. Boating Magazine, 946 F.2d 811, 813 (11th Cir. 1991).  Furthermore, the withheld facts are not privileged because the details concern exchanges that are unrelated to obtaining legal advice.  Genentech, Inc., 122 F.3d at 1415. Although the court is currently ill-positioned to precisely define the scope of facts that must be disclosed given the preliminary state of proceedings and defendant's failure to state what information may be missing, the record is clear that responsive facts have been improperly withheld.  Plaintiff is ordered to supplement its response to Interrogatory No. 4 with additional facts by working with defendant to determine what information is being sought.  See RCFC 26(b)(5)(A); see also White Mountain Apache Tribe of Ariz., 4 Cl. Ct. at 583 (noting that courts hold broad discretion to fashion discovery orders).

As to Interrogatory No. 8, plaintiff improperly withheld relevant factual information. Defendant requested that plaintiff explain the circumstances surrounding the settlement activities, but the relevant portion of plaintiff's answer lacks any such details.  Plaintiff merely answered that it engaged in mediation proceedings and later reached a settlement.  At the very least, this answer lacks facts regarding what occurred during the mediation or settlement discussions such as the parties' positions or offers.  Such facts, in addition to not being protected by the work-product privilege, are not shielded by the attorney-client privilege because any details shared between the parties during the mediation or settlement discussions were not made for the purposes of securing legal advice.  Additionally, the information is relevant because the Eubank action parties' positions and conversations provide context for evaluating whether plaintiff's decision to settle was reasonable and whether plaintiff's attorneys were pursuing justifiable lines of inquiry.  Therefore, as with Interrogatory No. 4, plaintiff is ordered to supplement its response with any relevant, missing facts and should do so by working with defendant to identify what information is being sought.

### 3. Attorney-Client Privilege and Attorney's Fees

Finally, defendant argues that plaintiff improperly withheld documents regarding attorney's fees in the Eubank action on the basis of attorney-client privilege.  Specifically, defendant contends that plaintiff's assertion of the attorney-client privilege for "communication[s] regarding fees" should be overruled because that privilege does not protect information concerning attorney's fees.  Plaintiff does not respond to this argument.[20]

The attorney-client privilege does not apply to general information regarding an attorney's representation of a client.  See Avgoustis v. Shinseki, 639 F.3d 1340, 1344-5 (Fed. Cir. 2011).  For example, "the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege."  Id. (quoting In re Grand Jury Subpoena, 204 F.3d 516, 520 (4th Cir. 2000)).  The attorney-client privilege does not attach to

---

[20]  Plaintiff discusses the requests for production to which the withheld documents are responsive but does so only in the context of arguing that there is no at-issue waiver. Defendant's argument here, however, is not concerned with whether there is a waiver; instead, defendant focuses on whether the attorney-client privilege applies to the documents in the first instance.

such information because it "ordinarily reveals no confidential professional communications between attorney and client . . . ." In re Grand Jury Matter, 926 F.2d 348, 352 (4th Cir. 1991) (quoting In re Osterhoudt, 722 F.2d 591, 593 (9th Cir. 1983)). "Absent special circumstances, disclosure of the identity of the client and fee information stand on a footing different from communications intended by the client to explain a problem to a lawyer in order to obtain legal advice." In re Shargel, 742 F.2d 61, 63 (2d Cir. 1984).

Here, plaintiff asserted the attorney-client privilege to support withholding two documents and justified that assertion in its May 2017 Privilege Log on the basis that the documents are "[a]ttorney-client communication[s] regarding fees in the Eubank v. KCPL case."[21]  Def.'s Mot. App. 92.  In its briefing, plaintiff failed to provide any further explanation for its assertion of the attorney-client privilege.  Plaintiff's vague explanation in its privilege log does not suggest that the withheld documents relate to anything other than a discussion of the fee amount or general purpose of the work performed by plaintiff's counsel in the Eubank action.  There is no indication that the communications were related to obtaining legal advice.  Thus, plaintiff fails to demonstrate that the withheld documents are covered by the attorney-client privilege.  See Evergreen Trading, 80 Fed. Cl. at 127 (placing burden on party asserting privilege).  Accordingly, plaintiff's privilege objection is overruled, and plaintiff is ordered to provide defendant with documents 13 and 14 in the May 2017 Privilege Log.

Having resolved defendant's contention that plaintiff improperly invoked the attorney-client and work-product privileges with respect to certain discovery requests, the court turns to defendant's contention that plaintiff impliedly waived any applicable privileges.

### D.  Implied Waiver:  Eubank Action Analysis and Settlement

The parties disagree on whether the nature of plaintiff's claims caused a waiver of otherwise applicable privileges.  Pursuant to what is commonly known as an "at-issue waiver," a party implicitly waives the attorney-client or work-product privilege if the protected information is critical to evaluating a claim.  Eden Isle Marina, 89 Fed. Cl. at 502.  Specifically, the waiver applies when:

> (1) [the] assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) [the] application of the privilege would have denied the opposing party access to information vital to [its] defense.

Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975); see also Eden Isle Marina, 89 Fed. Cl. at 503 (adopting the Hearn test after noting the absence of controlling precedent).

Relying on Hearn, defendant argues that plaintiff's assertion of an indemnification claim waived any privileges that would otherwise be applicable to plaintiff's analysis and settlement of

---

[21]  Plaintiff also asserted privilege over the two documents (and provided the same justification) in the March 2017 Privilege Log.

the Eubank action.  Specifically, defendant asserts that plaintiff placed at issue its litigation strategy, legal expenses, and settlement decision because plaintiff's claim is premised on the theory that (1) its decision to settle the Eubank action was reasonable and (2) its costs incurred as a result of that settlement were also reasonable.  Contending that there is an at-issue waiver, defendant moves to compel plaintiff to supplement its answers to various discovery requests on those issues.[22]  Even if there is no at-issue waiver, defendant argues that it has a substantial need for the work-product information on the issues noted above for the same reasons that the information is vital:  it is necessary to evaluate reasonableness.  Therefore, defendant contends that a motion to compel the disclosure of work product is warranted regardless of whether there is an at-issue waiver.

Unsurprisingly, plaintiff disagrees.  First, plaintiff argues that seeking indemnification for the settlement amount does not result in an at-issue waiver because, under the terms of the contract, the reasonableness of the settlement is not relevant.  Even if the contract was construed to require reasonableness, plaintiff asserts that its attorney's thoughts are irrelevant because the inquiry focuses on whether the settlement was reasonable in light of the risk of liability.  That determination, according to plaintiff, turns on an evaluation of the facts and the law—i.e., an objective inquiry that is not concerned with the attorney's beliefs.  Second, plaintiff argues that claiming attorney's fees does not result in an at-issue waiver because the substance of the legal advice is not relevant to evaluating the claim.  Plaintiff asserts that the reasonableness of the claimed fees is evaluated by reviewing hours worked and the tasks performed—both of which can be determined by the fee statements.  Finally, plaintiff argues that defendant has no substantial need for KCP&L's attorneys' work product because (1) the facts of the Eubank action are sufficient for defendant to argue against the settlement and (2) the billing statements provide sufficient details to evaluate the claimed fees.

### 1.  Settlement Decision

With regard to the settlement decision, the critical issue is whether plaintiff's burden to show that the settlement was reasonable puts at issue the legal advice underlying the decision to settle.[23]  Although the contract between plaintiff and the GSA does not explicitly condition

---

[22]  The noted topics are addressed in Interrogatory No. 3 and Request for Production Nos. 8, 9, 14, 18, 19, and 20—all of which plaintiff responded to by withholding information on the basis of the attorney-client and work-product privileges.  Based on those objections, plaintiff noted in the May 2017 Privilege Log that documents one through six, eight, nine, and eleven are responsive but not being produced.

[23]  The parties also discuss whether plaintiff must show that it was potentially or actually liable in the Eubank action to recover its settlement expenses, but neither party suggests that plaintiff's actual or potential liability in the Eubank action affects what is at issue in this case.  This approach appears to be correct as it is difficult to fathom how plaintiff's attorney's analysis during the Eubank action would be vital to assessing plaintiff's liability.  Even without access to privileged information, defendant cannot seriously argue that it is unable to conduct its own review of the pertinent facts and law to mount a defense against plaintiff's assertion that it faced actual or potential liability.

indemnification of settlement costs on whether the settlement was reasonable, a reasonableness requirement is nonetheless inferred into the agreement in the absence of express intent to the contrary.  See, e.g., Yakima Co. v. Lincoln Gen. Ins. Co., 583 F. App'x 744, 746 (9th Cir. 2014) (collecting cases for the proposition that courts routinely imply a reasonableness component into indemnity agreements); Conoco Inc. v. Boh Bros. Constr. Co., 191 F.R.D. 107, 111 (W.D. La. 1998) (addressing contractual indemnity and requiring the indemnitee show that it 'acted in accordance with equitable indemnity principles in making the settlement,' i.e., that the settlement was reasonable." (quoting Parfait v. Jahncke Serv., Inc., 484 F.2d 296, 301 (5th Cir. 1973))). The reasonableness inquiry requires evaluating the amount of the settlement in light of the size of possible recovery and the probability of the claimant's success against the indemnitee.  Luria Bros. & Co. v. All. Assur. Co., 780 F.2d 1082, 1091 (2d Cir. 1986); accord Burlington N., Inc. v. Hughes Bros., 671 F.2d 279, 282 (8th Cir. 1982) (considering the same factors but couching the analysis in terms of reasonableness and good faith); see also GAB Bus. Servs., Inc. v. Syndicate 627, 909 F.2d 755, 761 n.10 (11th Cir. 1987) (noting that courts consider "the certainty of liability, the risks of going to trial and the chances that the jury verdict might exceed the settlement offer").

There is no controlling precedent on whether the reasonableness inquiry in the indemnification context is an objective or subjective test.  Outside of this jurisdiction, courts are divided on the issue.[24]  Some follow the objective standard, which measures reasonableness according to what a reasonably prudent person would consider acceptable.  See Grace Vill. Health Care Facilities, Inc. v. Lancaster Pollard & Co., No. 3:11CV29, 2013 WL 4012662, at *3 (N.D. Ind. Aug. 6, 2013); see also First Am. Title Ins. Co. v. Bowles Rice, LLP, No. 1:16cv219, 2017 WL 6329953, at *4 (N.D. W. Va. Dec. 11, 2017) (interpreting state law requiring that the "amount paid was reasonable in light of the risk of exposure" and explaining that the standard "does not involve inquiry into the subjective belief of a settling indemnitee"); Wrangen v. Penn. Lumbermans Mut. Ins. Co., 593 F. Supp. 2d 1273, 1279 (S.D. Fla. 2008) (applying state law premised on a similar standard and explaining that the inquiry considers what a reasonably prudent person would believe); Jobe v. Int'l Ins. Co., 933 F. Supp. 844, 859 (D. Ariz. 1995) (describing the test as "what a reasonably prudent person in the insured's position would have settled for on the merits of the claimant's case," which "involves evaluating the facts bearing on the liability and damage aspects of the claimant's case, as well as the risks of going to trial"). Other courts, however, apply a subjective standard by considering what the indemnitee actually believed such that the indemnitee's analysis of the underlying case is at issue.  See Aerospatiale Helicopter Corp. v. Universal Health Servs., Inc., 778 S.W.2d 492, 500 (Tex. App. 1989) (stating an indemnitee must "establish from its standpoint [that] the settlement was made in good faith and was reasonable"); see also Abbott Labs. v. Alpha Therapeutic Corp., 200 F.R.D 401, 411

---

[24]  Further complicating the analysis, federal courts addressing the reasonableness of settlements in the indemnification context have done so by applying state law while sitting in diversity, e.g., Conoco, 191 F.R.D. at 117 (applying Louisiana law), while, in contrast, this case is controlled by federal common law, see Al-Kurdi v. United States, 25 Cl. Ct. 599, 601 (1992) ("In the context of contracts between the federal government and its citizens, the courts have opted for a uniform federal common law of contracts as the federal rule of decision, to avoid the uncertainty of conflicting state laws.").  The diversity decisions are nonetheless instructive given the scarcity of precedent addressing the federal common law on these issues.

(N.D. Ill. 2001) (explaining that documents relating to the underlying litigation are the only way for the indemnitor to evaluate the reasonableness of the indemnitee's settlement costs); Conoco, 191 F.R.D. at 114 (similar).

Applying the objective standard is the better approach.  An objective inquiry ensures that both parties receive what they bargained for in the indemnification provision.  Specifically, the standard prevents an indemnitor from obtaining unjustified benefits (i.e., avoiding the obligation to pay for a covered expense) while simultaneously assuaging any concerns against excessive or bad-faith settlements.[25]  In contrast, the requirement to consider an indemnitee's belief regarding a settlement serves no obvious purpose other than to provide opportunities for an indemnitor to reap windfalls by avoiding otherwise justified obligations to indemnify.  Therefore, the court adopts the objective standard for reasonableness when evaluating plaintiff's settlement in the indemnification context.

By submitting a claim for indemnification of settlement cost to the GSA and later filing a claim for the same to this court, plaintiff did not waive the attorney-client or work-product privilege with respect to information concerning plaintiff's strategy—including KCP&L's analysis of the claims and decision to settle—in the Eubank action.  As noted above, an at-issue waiver requires that (1) the privilege was asserted as a result of an affirmative act by the asserting party, (2) the affirmative act made the privileged information relevant to the case, and (3) the application of the privilege would deny the opposing party access to information vital to a defense.  Hearn, 68 F.R.D. at 581.  Plaintiff's assertion of the attorney-client or the work-product privilege satisfies only the first two prongs.  As to the first prong, plaintiff asserted the privileges in response to discovery requests concerning its claim for indemnification.  The second prong is also satisfied because defendant will likely need to repeat much of plaintiff's privileged analysis to determine whether the settlement was reasonable.  But defendant loses on the third prong because obtaining plaintiff's analysis of the settlement is not vital to a defense in this case.  Because assessing reasonableness is an objective inquiry, plaintiff's beliefs and KCP&L's attorneys' analysis of the Eubank action have no bearing on whether the settlement is ultimately reasonable.  Armed with access to the applicable laws as well as the underlying facts (gleaned through discovery or public records), defendant can assess "the size of possible recovery and degree of probability of claimant's success against the indemnitee."  Luria Bros. & Co., 780 F.2d at 1091.  That assessment is all that is required to mount a defense against plaintiff's assertion that it settled for a reasonable amount.  Furthermore, for the same reasons that the information is not vital, defendant's argument that it has a substantial need for the work product related to plaintiff's decision to settle the Eubank action also fails.

In its second supplemental brief, defendant argues, for the first time, that the parties' disagreement over coverage puts at issue plaintiff's conduct in the Eubank action.  Defendant

---

[25]  Because a reasonable person would not agree to settle for an unreasonable amount, a bad-faith settlement likely fails the objectively reasonable requirement.  But if such a settlement was objectively reasonable (i.e., an indemnitee intended to settle for an unreasonable amount but stumbled into an acceptable amount), there is no apparent reason for the indemnitor to be freed from its contractual duty to pay because the indemnitee would not receive a benefit to which it was not otherwise entitled.

disputes coverage for two reasons.  First, defendant contends that the accident giving rise to the claim did not occur on the GSA's side of the property.  Second, defendant asserts that the claims in the Eubank action were based on negligence, which defendant states are not covered by the indemnification agreement as a matter of public policy.  The court is troubled by the fact that defendant first raised this argument—waiver based on a dispute on coverage—in defendant's fifth brief on the motion to compel and in briefing that was requested on a different topic (tension between the objective and subjective components of reasonableness).  Nonetheless, the court will consider the argument given that (1) plaintiff had the opportunity to respond and (2) the argument has some merit.

Turning first to the dispute over where the injury occurred, an at-issue waiver is inappropriate with respect to information concerning plaintiff's attorneys' analysis of whether the accident occurred on plaintiff's or the GSA's side of the property.  This information may be helpful but it is not vital:  defendant can render its own conclusion by reviewing the facts that are a matter of public record or were shared through discovery.  But a different result is warranted with regard to plaintiff's legal theories underlying the decision to settle the Eubank action.  Given that the settlement encompasses all potential claims, plaintiff is the only source for learning whether the decision to settle was based solely on potential liability for negligence (which may not be indemnifiable) or how much of the settlement was allocated to such a claim.[26]  Therefore, this information is at issue and vital such that an at-issue waiver is warranted.  But the waiver is limited to information pertaining to the assessment of the "theories on which [the indemnitee's] attorney[s] relied" to justify settlement.  Abbott, 200 F.R.D. at 411.  Thus, plaintiff is ordered to supplement its answer to Interrogatory No. 8 by (1) stating whether KCP&L's settlement decision was premised on theories of liability sounding solely in negligence and (2) if not, explaining what other legal theories were deemed to pose legal risk and how such risk affected KCP&L's evaluation of settlement (e.g., how much of the settlement plaintiff allocated to each theory).  In accordance with Request for Production No. 14, plaintiff must also produce any documents relied on to supplement plaintiff's response to Interrogatory No. 8.

## 2.  Attorney's Fees

To prevail on its claim for attorney's fees, plaintiff must at least show that the claimed fees are reasonable.  See Yakima Co., 583 F. App'x at 746 (noting that courts require that the attorney's fees recovered pursuant to an indemnity contract be reasonable when the contract is silent on the issue); Cotten v. Two "R" Drilling Co., 508 F.2d 669, 671 (5th Cir. 1975) (noting that it is "well settled" that an indemnitee may recover "reasonable expenses" and "that these expenses include attorney's fees").  Given the reasonableness component of a fee claim, a party seeking attorney's fees waives the attorney-client and work-product privileges regarding the work performed because the opposing party is not required to blindly accept that the claimed dollar amount is reasonable.  Pamida, Inc. v. E.S. Originals, Inc., 281 F.3d 726, 731 (8th Cir. 2002).  The scope of the waiver generally encompasses only the descriptions of the attorney's

---

[26]  The court does not resolve the issue of whether the indemnification agreement covers negligence claims because, regardless of how the issue is resolved, information concerning the allocation of a settlement between negligence and nonnegligence claims is clearly relevant to a defense.  See RCFC 26(b)(1) (permitting discovery of information relevant to a defense).

tasks (e.g., time entries) and does not extend to the substance of the work.  See Nationwide Payment Sols., LLC v. Plunkett, 831 F. Supp. 2d 337, 339 & n.1 (D. Me. 2011) (recognizing a waiver for invoices and noting that "[t]here is precedent for confining any such implied waiver to the fee invoices themselves, eschewing any finding of a broader waiver as to the underlying subject matter"); see also Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co., 129 F.3d 143, 151-52 (D.C. Cir. 1997) (explaining that a claim for attorney's fees requires nonredacted billing statements); Feld v. Fireman's Fund Ins. Co., 292 F.R.D. 129, 138 (D.D.C. 2013) (applying waiver to invoices as well as materials explaining the charges); 670 Apartments Corp. v. Agric. Ins. Co., No. 96CIV.1464(PKL)(JCF), 1997 WL 801458, at *1-2 (S.D.N.Y. 1997) (explaining that a claim for attorney's fees does not put the substance of the advice at issue and that such a claim can be evaluated by reference to the time records); Remington Arms Co. v. Liberty Mut. Ins. Co., 142 F.R.D. 408, 414 (D. Del. 1992) (explaining that a party "claiming that its attorney's fees or actions in the underlying litigation were reasonable . . . does not forfeit its protection of the privileged documents" so long as the party does not rely on the nature of the legal advice or introduce its contents to establish liability).  This approach comports with the rationale for the at-issue-waiver rule because requiring plaintiff to disclose meaningful information regarding the nature of the work is necessary for a substantive debate over the claimed attorney's fees  See Pamida, 281 F.3d at 732 (explaining that an at-issue waiver is appropriate when a party seeks a greater advantage from its control over privileged material than necessary for a healthy adversarial system).

Defendant presents no compelling reason to deviate from the norm.  Although knowing the substance of the analysis giving rise to the payment of attorney's fees would provide insight into whether a line of inquiry was fruitful, the reasonableness inquiry does not depend on such after-the-fact evaluations of attorney conduct.  Cf. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978) (addressing a statute providing an award of attorney's fees to a successful defendant when the plaintiff's claim was unreasonable and noting the importance of "resist[ing] the understandable temptation to engage in post hoc reasoning by concluding that, because [the claimant] did not ultimately prevail, his action must have been unreasonable or without foundation").  It is sufficient that a line of inquiry was reasonable when started and an appropriate amount of time was spent on the task—information that can be gleaned from itemized descriptions of the tasks on a billing statement when viewed in conjunction with the facts of the case.  Additionally, defendant's concern that the billing statements lack sufficient detail to evaluate the reasonableness of the work performed provides no basis to expand the scope of an at-issue waiver because a party cannot recover fees premised on vague or generic descriptions.  See, e.g., Lipsett v. Blanco, 975 F.2d 934, 938 (1st Cir. 1992) (affirming reduction of hours where "several entries contain[ed] only gauzy generalities" too nebulous to allow the opposing party to dispute their accuracy or reasonableness); In re Donovan, 877 F.2d 982, 995 (D.C. Cir. 1989) (affirming exclusion of hours with "vague description[s] such as legal issues," "conference re all aspects," and "call re status").  In light of the above, the at-issue waiver flowing from plaintiff's claim for attorney's fees does not apply beyond the billing statements that the parties indicate were already exchanged.  Given that defendant can evaluate the reasonableness of the claimed fees based on these statements, defendant's argument that it has a substantial need for the underlying work product also fails.

### E.  Express Waiver

In addition to advancing arguments in support of an at-issue waiver, defendant contends that the plaintiff expressly waived the asserted privileges with respect to certain information.

## 1. Claim Submitted to the Contracting Officer

Defendant initially argued that plaintiff waived any privileges associated with Request for Production Nos. 13 and 15 by asserting privilege for the first time in the privilege logs provided more than thirty days after plaintiff's response was due. Defendant subsequently withdrew this argument in its supplemental reply brief. Defendant continues to argue, however, that plaintiff withheld responsive information to Interrogatory No. 7 on the basis of the attorney-client or work-product privilege despite waiving those privileges by not stating them in response to the interrogatory. Defendant further contends that the waiver extends to the documents plaintiff used to answer Interrogatory No. 7—which defendant requested in Request for Production No. 13—but is withholding as privileged, as reflected on the March 2017 Privilege Log and the May 2017 Privilege Log. Relying on United States v. Phillip Morris, Inc., 347 F.3d 951 (D.C. Cir. 2003), plaintiff responds that it did not waive any privileges because KCP&L was entitled to wait until the resolution of its objections to the scope and relevance of the interrogatory before stating attorney-client or work-product objections.

The court agrees with defendant that plaintiff's answer to Request for Production No. 13 suggests that details responsive to Interrogatory No. 7 are being withheld on the basis of privilege. Thus, the question is whether that information can be withheld based on a delayed claim of privilege. After an interrogatory is served, the responding party has thirty days to answer the substance of the request and state any objections. RCFC 33(b)(2). "Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure." RCFC 33(b)(4). Here, plaintiff failed to lodge any privilege objections to Interrogatory No. 7 within thirty days of the interrogatory being served and presents no argument why good cause exists to preclude waiver. Accordingly, plaintiff waived those objections as to Interrogatory No. 7 and is ordered to supplement its answer to Interrogatory No. 7 with any information that was withheld on the basis of the attorney-client or work-product privilege.[27]

Plaintiff's argument that Phillip Morris changes the waiver dynamic is unconvincing. In Phillip Morris, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") held that a party is entitled to a ruling on its nonprivilege objections to a request for production before being obligated to list documents purportedly covered by those objections on a privilege log. Id. at 952. The D.C. Circuit explained that, in that scenario, a party only risks

---

[27] Defendant makes a passing reference to subject matter waiver in the briefing without developing the argument by, for example, proposing the scope of such a waiver. The parties also have not had the opportunity to discuss the developments in this case giving rise to the subject matter waiver—i.e., the recognition of a waiver for Interrogatory No. 7. Accordingly, an order determining scope of a subject matter waiver and compelling disclosure based on that decision is premature. The parties should attempt to resolve any such issues amongst themselves. See RCFC 37(a) (emphasizing the importance of parties working together to resolve disputes before turning to the courts).

waiver when the documents do not fall within the scope of the objection or the objection was made in bad faith. Id. But Phillip Morris is inapplicable here because the decision dealt with requests for production under FRCP 34—a rule that does not contain an automatic waiver provision akin to the one governing interrogatories. See FRCP 34(b)(4); see also Flintco, Inc. v. United States, No. 10-178C, 2012 WL 3276158, at *4 (Fed. Cl. Aug. 10, 2012) (noting that RCFC 33 (interrogatories) contains an automatic waiver provision while RCFC 34 (requests for production) does not). Indeed, since Phillip Morris was decided, courts have held that a party waives attorney-client or work-product objections by failing to assert them within the time frame to respond to interrogatories regardless of whether other objections were submitted in response. See, e.g., Cardenas v. Dorel Juvenile Grp., Inc., 231 F.R.D. 616, 620 (D. Kan. 2005) (concluding that privilege objections to interrogatories were waived when the objections were not included with the timely submitted objections based on other grounds).

## 2. Settlement Discussions

Defendant also moves to compel responses to discovery requests concerning settlement discussions on the theory that plaintiff expressly waived any privileges that would justify withholding information on that topic. Defendant focuses its argument on Interrogatory No. 8, which contained defendant's request for information concerning the mediation and settlement in the Eubank action, and the related Request for Production No. 19. Defendant gives particular attention to a mediation statement (document five on the May 2017 Privilege Log) that is responsive to the request for production but was not produced. Plaintiff does not respond to defendant's argument.

Turning first to Interrogatory No. 8, defendant nominally argues that plaintiff may be providing an incomplete response because plaintiff's answer was provided subject to assertions of the attorney-client and work-product privileges. Defendant baldly claims that neither privilege is applicable, but fails to explain why that is so. Instead, defendant focuses exclusively on withheld documents—the mediation statement and other documents that plaintiff did not produce in response to Request for Production No. 19.[28] The relationship, if one exists, between the argument concerning the withheld documents and the interrogatory is unclear, and the court will not further address the matter, especially given that the court is ordering plaintiff to supplement its answer to Interrogatory No. 8 with additional facts. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."),

With regard to Request for Production No. 19, defendant argues that plaintiff must produce any responsive documents that were shared with the Eubank action claimants because the work-product privilege does not apply to documents that were shared with a third party. The privilege logs currently before the court, however, do not show any other documents that were

---

[28] Defendant argued against the existence of a settlement privilege—a privilege that was only asserted as a basis to withhold document five in the May 2017 Privilege Log. Defendant also argued that the work-product privilege did not apply to the (1) mediation statement because it was unclear that plaintiff attempted to maintain its confidentiality or (2) documents shared between the parties in the Eubank action.

both withheld in this case and shared with the claimants in the Eubank action.  An order compelling the production of documents that may not exist is imprudent at this time, especially given that the dispute may become moot when plaintiff supplements its privilege log or states that no additional documents are being withheld.  See supra Section III.B (ordering plaintiff to review its privilege logs for missing documents).

As to the mediation statement, defendant argues that plaintiff improperly withheld the document because the asserted privileges—the work-product and settlement-communication privileges—are inapplicable.  The work-product privilege does not act as a barrier to production because plaintiff fails to explain why that privilege was not waived by sharing the document with the mediator—a third party who was working with both parties.  See Genentech, 122 F.3d at 1415 (noting that sharing work-product materials with a third party generally results in a waiver); United States v. Deloitte LLP, 610 F.3d 129, 140 (D.C. Cir. 2010) ("[T]he voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection for that material.").  As to the settlement-communication privilege, the Court of Appeals for the Federal Circuit ("Federal Circuit") has declined to recognize such a privilege.  In re MSTG, Inc., 675 F.3d 1337, 1348 (Fed. Cir. 2012).  The Federal Circuit explained that "the public policy goals argued to support a [settlement-communication] privilege can more appropriately be achieved by limiting the scope of discovery"—i.e., imposing a heightened standard to obtain settlement information.  Id. at 1347.  That same rationale applies equally to mediation communications.  Indeed, the Federal Circuit supported its decision, at least in part, by discussing how the ruling was in accord with a decision by the United States Court of Appeals for the Second Circuit's that  imposed a heightened standard to discover mediation materials.  Id.  Accordingly, plaintiff's assertion of a settlement-communication privilege cannot justify withholding the mediation statement, and plaintiff is ordered to provide the document to defendant.[29]

### 3. AEGIS Documents

Defendant next moves to compel plaintiff to produce responsive documents that were shared with AEGIS and withheld based on the joint-defense,[30] attorney-client, or work-product privilege.[31]  Defendant argues that plaintiff must produce the documents because plaintiff, by

---

[29]  For the same reasons discussed with regard to Interrogatory No. 7, an analysis of subject matter waiver is premature.  See supra note 27.  Before the court intervenes on that topic, the parties should attempt to work together to resolve any discovery issues resulting from the decision compelling production of the mediation statement.

[30]  As noted above, the "joint-defense privilege" is more accurately called the "common-interest rule."  Defendant, however, treats the two terms as reflecting separate but related concepts—a belief that is not unfounded (even if this court disagrees).  For the sake of clarity, the court outlines defendant's argument as it was presented in the briefs but analyzes the waiver issue by discussing the common-interest rule—a concept that envelops the joint-defense privilege.

[31]  Using the May 2017 Privilege Log as a reference, defendant explains that it is seeking to compel production of documents one through six, nine, eleven, and twelve because they were

sharing the information with AEGIS (a third party), waived any privilege. Defendant contends that the joint-defense privilege does not preclude a waiver of the attorney-client or work-product privilege because plaintiff fails to show that it and AEGIS were coparties in the Eubank action, exchanged legal advice in the withheld communications, or entered into a written joint-defense agreement. Acknowledging the overlap between the joint-defense privilege and the common-interest rule, defendant also contends that the common-interest rule does not apply because plaintiff fails to demonstrate that (1) it and AEGIS employed a single lawyer to act for them in the Eubank action, (2) AEGIS was obligated to defend plaintiff in the Eubank action, or (3) plaintiff and AEGIS's communications were related to anything other than business communications. Even if the common-interest rule applies, defendant argues that plaintiff must produce all of the documents shared with AEGIS because plaintiff created a subject matter waiver by producing to defendant one of the documents—document six in the May 2017 Privilege Log—that was shared with AEGIS.

Plaintiff responds that the common-interest rule applies. Specifically, plaintiff contends that the rule applies here because (1) AEGIS, as plaintiff's excess insurer, possessed a direct economic stake in the Eubank action and (2) AEGIS and plaintiff shared a common interest in the outcome of that case as well as recovering money from defendant. Plaintiff also asserts that the common-interest rule, contrary to defendant's argument, applies when the parties who exchange information have different attorneys. Plaintiff is silent on the matter of a subject matter waiver.

Defendant presents the stronger argument given some notable omissions in plaintiff's briefing. Despite bearing the burden of showing that the common-interest rule applies, plaintiff does not provide details regarding AEGIS's role during or after the Eubank action other than stating that AEGIS was plaintiff's excess insurer. Importantly, plaintiff does not address whether AEGIS appointed plaintiff's counsel or was required to defend plaintiff in the Eubank action. On these facts, plaintiff cannot establish that the common-interest rule applies to information shared with AEGIS prior to the settlement, and a decision regarding the rule's application to information shared after the settlement is premature. Both are addressed in turn.

### a. Pre-Eubank Action Settlement

Plaintiff identified one document—document six on the May 2017 Privilege Log—that was shared with AEGIS prior to settling the Eubank action. The fact that this information was shared with a third party constitutes a waiver of the attorney-client and work-product privileges unless plaintiff demonstrates that the common-interest rule applies. Plaintiff fails to make such a showing.

---

"shared or exchanged with [plaintiff's insurer]." Def.'s Suppl. Br. 6. But see Def.'s Mot. 26 (explaining that the AEGIS materials include documents six, nine, eleven, and twelve on the May 2017 Privilege Log). The privilege log, however, does not reflect that all of those documents were shared with AEGIS; indeed, plaintiff states in the privilege log that only documents six, nine, eleven, and twelve were directed to AEGIS, and defendant does not explain why it concludes that the remaining documents were shared with the insurer.

First, plaintiff presents insufficient evidence that it shared a common interest with AEGIS during the time in question.  The fact that AEGIS was plaintiff's excess insurer—the only evidence plaintiff presents to support its argument for applying the common-interest rule—is not enough.  See N.L. Indus., Inc. v. Commercial Ins. Co., 144 F.R.D. 225, 232 (D.N.J. 1992) ("Mere status as an insurer or an insured is not enough to establish a commonality of interest."). In the insurer-insured context, a common interest requires, at least, that the insurer (1) was obligated to defend the insured and (2) paid or appointed the insured's counsel.  See N. River Ins. Co. v. Phila. Reins. Corp., 797 F. Supp. 363, 366 (D.N.J. 1992) ("The common interest [rule] has been recognized in the insured/insurer context when counsel has been retained or paid for by the insurer . . . ."); Nationwide Mut. Ins. Co. v. LaFarge Corp., No. H-90-2390, 1992 U.S. Dist. LEXIS 21838, at *8 (D. Md. 1992) (agreeing with other courts that the common-interest rule applies "only when it has been determined that the defendant insurer is obligated to defend the underlying action brought against the insured"); Cary-Canada, Inc. v. Aetna Cas. & Sur. Co., 118 F.R.D. 250, 251 (D.D.C. 1987) (explaining that the common-interest rule does not apply when an insurer was not obligated to defend the insured and did not assume that defense). Plaintiff has not established either element; there is no indication that AEGIS was obligated to defend plaintiff, appointed plaintiff's counsel, or paid for plaintiff's counsel while plaintiff was exchanging information with AEGIS regarding the ongoing Eubank action.[32]

Second, even if there was a common interest, plaintiff fails to demonstrate that any communications prior to the settlement were made in furtherance of the shared interest.  In the May 2017 Privilege Log, plaintiff provided a vague description of the withheld document— "[c]ommunication with insurer related to litigation," Def.'s Mot. App. 91—and presents no other evidence reflecting the purpose of the communication.  Although evidence submitted by defendant reflects that plaintiff kept AEGIS informed of the proceedings, the purpose of the updates is unclear.  See Strougo v. BEA Assocs., 199 F.R.D. 515, 520 (S.D.N.Y. 2001) (requiring that parties demonstrate actual cooperation toward a common legal goal and noting that theoretically sharing similar interests is insufficient).  The lack of clarity is especially important in the context of insurance because insureds may exchange business communications with an insurer as part of a contractual obligation to keep the insurer informed regarding a claim rather than as part of an effort to further a common interest.  See In re Imperial Corp. of Am., 167 F.R.D. 447, 455 (S.D. Cal. 1995) (explaining that mandated exchanges of information in the insurance context do not qualify as communications in furtherance of a common interest).

In sum, plaintiff fails to show that the common-interest rule applies to information exchanged between plaintiff and AEGIS prior to the settlement of the Eubank action.  Because the common-interest rule does not apply, plaintiff waived any claim to the attorney-client or work-product privilege by sharing the information with AEGIS.  Therefore, plaintiff must produce to defendant any documents shared with AEGIS prior to the settlement that are responsive to a request for production.[33]

---

[32]  The record suggests that payment was made after the case had concluded.

[33]  By ordering production of all responsive documents shared with AEGIS prior to the settlement, there is no need to consider whether the apparent production of document six on the May 2017 Privilege Log results in a subject matter waiver.  Moreover, an order compelling

**b.  Post-Eubank Action Settlement**

Turning to the information exchanged between plaintiff and AEGIS after the Eubank action settlement,[34] a determination regarding applicability of the common-interest rule in that context requires additional information.  Plaintiff appears to satisfy the first prong:  AEGIS and plaintiff having a common interest in pursuing a claim against the GSA to recover the amounts they spent on the Eubank action.  But plaintiff fails to demonstrate that it satisfies the rule's second prong:  the court cannot discern whether the documents were shared in furtherance of a common interest because the descriptions in the privilege log are vague.  Specifically, in the May 2017 Privilege Log, plaintiff provides the following descriptions:

- Communication with insurer related to anticipated litigation.

- Communication related to pursuing anticipated litigation.

- Communication with AEGIS discussing contribution and indemnity claim.

Def.'s Mot. App. 92.  Those descriptions, without additional context, are amenable to two interpretations—one favoring the common-interest rule and one that does not.  Indeed, the communications could reflect that plaintiff was either (1) providing AEGIS with contractually mandated updates regarding potential claims that plaintiff intended to pursue or (2) discussing with AEGIS potential legal strategies that the companies could pursue to recover their settlement costs and expenses from defendant.  Without more detail regarding the purpose of these communications, a decision on the application of the common-interest rule is premature.  Accordingly, plaintiff is ordered supplement its privilege log with enough detail to enable defendant (or, if necessary, the court) to assess the purpose of plaintiff's withheld communications with AEGIS that postdate the Eubank action settlement.

**F.  Adverse Interest**

Finally, defendant argues that an adverse inference may be warranted at a later date if plaintiff fails to comply with future discovery obligations.  If noncompliance issues arise in the future, defendant is welcome to raise those concerns and request an adverse inference.  But a ruling now on such potential conduct and the consequences thereof is premature.  Thus, the request for an adverse inference is denied.

**G.  RCFC 37 Expenses**

---

discovery based on a subject matter waiver is premature for the same reasons discussed above with regard to Interrogatory No. 7.  See supra note 27.

[34]  These documents are identified in the May 2017 Privilege Log as documents nine, eleven, and twelve.

Given that both parties have prevailed in part, they may both move for reasonable expenses in accordance with RCFC 37(a)(5)(C).  Any award under that rule, however, is discretionary.  RCFC 37(a)(5)(C) ("If the motion is granted in part and denied in part, the court may . . . apportion the reasonable expenses for the motion."); accord New Orleans Reg'l Physician Hosp. Org., Inc. v. United States, 122 Fed. Cl. 807, 820 (2015) (noting that the RCFC 37(a)(5)(C) "standard allows the court to exercise discretion in determining if attorney's fees are warranted").  Here, the novelty and complexity of most of the issues would seem to suggest that expenses are not appropriate for either party.  See Fairholme Funds, Inc. v. United States, 132 Fed. Cl. 391, 393 (2017) (explaining that fees are not appropriate when there is a genuine dispute or if reasonable people could disagree).  Nonetheless, the court will not prevent the parties from seeking such relief.

## IV.  CONCLUSION

In sum, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to compel.  As explained in greater detail above, plaintiff must supplement its discovery responses by:

- adding facts to the responses to Interrogatory Nos. 4 and 8;

- updating its most recent privilege log with any documents that are being withheld based on a privilege;

- supplementing its most recent privilege log with details regarding the purpose of any communications with AEGIS that postdate the Eubank action settlement;

- producing documents 5, 13, and 14 as identified in the May 2017 Privilege Log, as well as any documents shared with AEGIS that predate the Eubank action settlement;

- identifying whether its settlement decision was premised on theories of liability sounding only in negligence and producing any documents relied on to determine that answer;[35] and

- revising its response to Interrogatory No. 7 with any information that was withheld on the basis of the attorney-client or work-product privilege.

The parties shall file a joint status report by than **no later than Thursday, August 16, 2018,** setting forth a proposed schedule for complying with this order.  In that the report, the parties

---

[35] As noted in Section III.E.3.a., supra, if plaintiff states that it settled in part because of potential liability for nonnegligence claims, then plaintiff must identify the potential claims and how those claims affected KCP&L's decision to settle.

should also present their respective positions on whether the deadlines for plaintiff to supplement its responses and the deadlines for the discovery matters addressed in the court's December 18, 2017 order should be set based on when defendant's motion for judgment on the pleadings is resolved.

Additionally, the court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Thursday, August 23, 2018,** the parties shall file a joint status report indicating their agreement with the proposed redactions, attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge